# CITY OF LOS ANGELES *v.* LYONS

No. 81–1064.   Argued November 2, 1982—Decided April 20, 1983

96

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 113.

*Frederick N. Merkin* argued the cause for petitioner. With him on the briefs were *Ira Reiner* and *Lewis N. Unger*.

*Michael R. Mitchell* argued the cause for respondent. With him on the brief were *Fred Okrand* and *Charles S. Sims.**

JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether respondent Lyons satisfied the prerequisites for seeking injunctive relief in the Federal District Court.

I

This case began on February 7, 1977, when respondent, Adolph Lyons, filed a complaint for damages, injunction, and declaratory relief in the United States District Court for the Central District of California. The defendants were the City of Los Angeles and four of its police officers. The complaint alleged that on October 6, 1976, at 2 a. m., Lyons was stopped by the defendant officers for a traffic or vehicle code violation and that although Lyons offered no resistance or threat whatsoever, the officers, without provocation or justification, seized Lyons and applied a "chokehold"[1]—either

---

*Briefs of *amici curiae* urging reversal were filed by *Robert J. Logan* for the City of San Jose, California, et al.; by *Myron L. Dale* for the National Association of Chiefs of Police et al.; by *Benjamin L. Brown, J. Lamar Shelley, James B. Brennan, Henry W. Underhill, Jr., Roy D. Bates, George Agnost, Roger F. Cutler, John Dekker, Lee E. Holt, George F. Knox, Jr., Walter M. Powell, William H. Taube, Aaron A. Wilson, John W. Witt, Max P. Zall, Conard B. Mattox, Jr.,* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers; and by *George J. Franscell, Wayne W. Schmidt,* and *Courtney E. Evans* for the Los Angeles Police Protective League et al.

[1] The police control procedures at issue in this case are referred to as "control holds," "chokeholds," "strangleholds," and "neck restraints." All these terms refer to two basic control procedures: the "carotid" hold and the "bar arm" hold. In the "carotid" hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located

the "bar arm control" hold or the "carotid-artery control" hold or both—rendering him unconscious and causing damage to his larynx.   Counts I through IV of the complaint sought damages against the officers and the City.   Count V, with which we are principally concerned here, sought a preliminary and permanent injunction against the City barring the use of the control holds.   That count alleged that the City's police officers, "pursuant to the authorization, instruction and encouragement of Defendant City of Los Angeles, regularly and routinely apply these choke holds in innumerable situations where they are not threatened by the use of any deadly force whatsoever," that numerous persons have been injured as the result of the application of the chokeholds, that Lyons and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that Lyons "justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse."   Lyons alleged the threatened impairment of rights protected by the First, Fourth, Eighth, and Fourteenth Amendments.   Injunctive relief was sought against the use of the control holds "except in situations where the proposed victim of said control reasonably appears to be threatening the immediate use of deadly force."   Count VI sought declaratory relief against the City, *i. e.*, a judgment that use of the chokeholds absent the threat of immediate use of deadly force is a *per se* violation of various constitutional rights.

The District Court, by order, granted the City's motion for partial judgment on the pleadings and entered judgment for

---

on the sides of the subject's neck.   The "carotid" hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain.   The "bar arm" hold, which is administered similarly, applies pressure at the front of the subject's neck.   "Bar arm" pressure causes pain, reduces the flow of oxygen to the lungs, and may render the subject unconscious.

the City on Counts V and VI.[2]   The Court of Appeals reversed the judgment for the City on Counts V and VI, holding over the City's objection that despite our decisions in *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), and *Rizzo* v. *Goode,* 423 U. S. 362 (1976), Lyons had standing to seek relief against the application of the chokeholds.   *Lyons* v. *City of Los Angeles,* 615 F. 2d 1243 (1980).   The Court of Appeals held that there was a sufficient likelihood that Lyons would again be stopped and subjected to the unlawful use of force to constitute a case or controversy and to warrant the issuance of an injunction, if the injunction was otherwise authorized. We denied certiorari.   449 U. S. 934 (1980).

On remand, Lyons applied for a preliminary injunction. Lyons pressed only the Count V claim at this point.   See n. 6, *infra.*   The motion was heard on affidavits, depositions, and government records.   The District Court found that Lyons had been stopped for a traffic infringement and that without provocation or legal justification the officers involved had applied a "Department-authorized chokehold which resulted in injuries to the plaintiff."   The court further found that the department authorizes the use of the holds in situations where no one is threatened by death or grievous bodily harm, that officers are insufficiently trained, that the use of the holds involves a high risk of injury or death as then employed, and that their continued use in situations where neither death nor serious bodily injury is threatened "is unconscionable in a civilized society."   The court concluded that such use violated Lyons' substantive due process rights under the Fourteenth Amendment.   A preliminary injunc-

---

[2] The order also gave judgment for the City on Count II insofar as that Count rested on the First and Eighth Amendments, as well as on Count VII, which sought a declaratory judgment that the City Attorney was not authorized to prosecute misdemeanor charges.   It appears from the record on file with this Court that Counts III and IV had previously been dismissed on motion, although they reappeared in an amended complaint filed after remand from the Court of Appeals.

tion was entered enjoining "the use of both the carotid artery and bar arm holds under circumstances which do not threaten death or serious bodily injury." An improved training program and regular reporting and recordkeeping were also ordered.[3] The Court of Appeals affirmed in a brief *per curiam* opinion stating that the District Court had not abused its discretion in entering a preliminary injunction. 656 F. 2d 417 (1981). We granted certiorari, 455 U. S. 937 (1982), and now reverse.

## II

Since our grant of certiorari, circumstances pertinent to the case have changed. Originally, Lyons' complaint alleged that at least two deaths had occurred as a result of the application of chokeholds by the police. His first amended complaint alleged that 10 chokehold-related deaths had occurred. By May 1982, there had been five more such deaths. On May 6, 1982, the Chief of Police in Los Angeles prohibited the use of the bar-arm chokehold in any circumstances. A few days later, on May 12, 1982, the Board of Police Commissioners imposed a 6-month moratorium on the use of the carotid-artery chokehold except under circumstances where deadly force is authorized.[4]

---

[3] By its terms, the injunction was to continue in force until the court approved the training program to be presented to it. It is fair to assume that such approval would not be given if the program did not confine the use of the strangleholds to those situations in which their use, in the view of the District Court, would be constitutional. Because of successive stays entered by the Court of Appeals and by this Court, the injunction has not gone into effect.

[4] The Board of Police Commissioners directed the Los Angeles Police Department (LAPD) staff to use and assess the effectiveness of alternative control techniques and report its findings to the Board every two months. Prior to oral argument in this case, two such reports had been submitted, but the Board took no further action. On November 9, 1982, the Board extended the moratorium until it had the "opportunity to review and evaluate" a third report from the Police Department. Insofar as we are advised, the third report has yet to be submitted.

Based on these events, on June 3, 1982, the City filed in this Court a memorandum suggesting a question of mootness, reciting the facts but arguing that the case was not moot. Lyons in turn filed a motion to dismiss the writ of certiorari as improvidently granted. We denied that motion but reserved the question of mootness for later consideration. 457 U. S. 1115 (1982).

In his brief and at oral argument, Lyons has reasserted his position that in light of changed conditions, an injunctive decree is now unnecessary because he is no longer subject to a threat of injury. He urges that the preliminary injunction should be vacated. The City, on the other hand, while acknowledging that subsequent events have significantly changed the posture of this case, again asserts that the case is not moot because the moratorium is not permanent and may be lifted at any time.

We agree with the City that the case is not moot, since the moratorium by its terms is not permanent. Intervening events have not "irrevocably eradicated the effects of the alleged violation." *County of Los Angeles* v. *Davis*, 440 U. S. 625, 631 (1979). We nevertheless hold, for another reason, that the federal courts are without jurisdiction to entertain Lyons' claim for injunctive relief.

## III

It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy. *Flast* v. *Cohen*, 392 U. S. 83, 94–101 (1968); *Jenkins* v. *McKeithen*, 395 U. S. 411, 421–425 (1969) (opinion of MARSHALL, J.). Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). Abstract injury is not enough. The plaintiff must

show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." See, *e. g., Golden* v. *Zwickler,* 394 U. S. 103, 109–110 (1969); *Public Workers* v. *Mitchell,* 330 U. S. 75, 89–91 (1947); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941); *Massachusetts* v. *Mellon,* 262 U. S. 447, 488 (1923).

In *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), we dealt with a case brought by a class of plaintiffs claiming that they had been subjected to discriminatory enforcement of the criminal law. Among other things, a county magistrate and judge were accused of discriminatory conduct in various respects, such as sentencing members of plaintiff's class more harshly than other defendants. The Court of Appeals reversed the dismissal of the suit by the District Court, ruling that if the allegations were proved, an appropriate injunction could be entered.

We reversed for failure of the complaint to allege a case or controversy. *Id.,* at 493. Although it was claimed in that case that particular members of the plaintiff class had actually suffered from the alleged unconstitutional practices, we observed that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.,* at 495–496. Past wrongs were evidence bearing on "whether there is a real and immediate threat of repeated injury." *Id.,* at 496. But the prospect of future injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners." *Ibid.* The most that could be said for plaintiffs' standing was "that *if* [plaintiffs] proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory prac-

tices that petitioners are alleged to have followed." *Id.*, at 497. We could not find a case or controversy in those circumstances: the threat to the plaintiffs was not "sufficiently real and immediate to show an existing controversy simply because they anticipate violating lawful criminal statutes and being tried for their offenses. . . ." *Id.*, at 496. It was to be assumed that "[plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners." *Id.*, at 497.

We further observed that case-or-controversy considerations "obviously shade into those determining whether the complaint states a sound basis for equitable relief," *id.*, at 499, and went on to hold that even if the complaint presented an existing case or controversy, an adequate basis for equitable relief against petitioners had not been demonstrated:

> "[Plaintiffs] have failed, moreover, to establish the basic requisites of the issuance of equitable relief in these circumstances—the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law. We have already canvassed the necessarily conjectural nature of the threatened injury to which [plaintiffs] are allegedly subjected. And if any of the [plaintiffs] are ever prosecuted and face trial, or if they are illegally sentenced, there are available state and federal procedures which could provide relief from the wrongful conduct alleged." *Id.*, at 502.

Another relevant decision for present purposes is *Rizzo* v. *Goode*, 423 U. S. 362 (1976), a case in which plaintiffs alleged widespread illegal and unconstitutional police conduct aimed at minority citizens and against city residents in general. The Court reiterated the holding in *O'Shea* that past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy. The claim of injury rested upon "what one of a small, unnamed minority of policemen might do to them in the future

because of that unknown policeman's perception" of departmental procedures. 423 U. S., at 372. This hypothesis was "even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant [the] invocation of federal jurisdiction." *Ibid.* The Court also held that plaintiffs' showing at trial of a relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief.

*Golden* v. *Zwickler*, 394 U. S. 103 (1969), a case arising in an analogous situation, is directly apposite. Zwickler sought a declaratory judgment that a New York statute prohibiting anonymous handbills directly pertaining to election campaigns was unconstitutional. Although Zwickler had once been convicted under the statute,[5] his sole concern related to a Congressman who had left the House of Representatives for a place on the Supreme Court of New York and who would not likely be a candidate again. A unanimous Court held that because it was "most unlikely" that Zwickler would again be subject to the statute, no case or controversy of "'sufficient immediacy and reality'" was present to allow a declaratory judgment. *Id.*, at 109. Just as Zwickler's assertion that the former Congressman could be a candidate for Congress again was "hardly a substitute for evidence that this is a prospect of 'immediacy and reality,'" *ibid.*, Lyons' assertion that he may again be subject to an illegal chokehold does not create the actual controversy that must exist for a declaratory judgment to be entered.

We note also our *per curiam* opinion in *Ashcroft* v. *Mattis*, 431 U. S. 171 (1977). There, the father of a boy who had been killed by the police sought damages and a declaration that the Missouri statute which authorized police officers to use deadly force in apprehending a person who committed a felony was unconstitutional. Plaintiff alleged that he had an-

---

[5] Zwickler's conviction was reversed on state-law grounds. 394 U. S., at 105.

other son, who " '*if* ever arrested or brought under an attempt at arrest on suspicion of a felony, *might* flee or give the appearance of fleeing, and would therefore be *in danger* of being killed by these defendants or other police officers . . . .' " *Id.*, at 172, n. 2. We ruled that "[s]uch speculation is insufficient to establish the existence of a present, live controversy." *Id.*, at 173, n. 2.

## IV

No extension of *O'Shea* and *Rizzo* is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought.[6] Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have

---

[6] The City states in its brief that on remand from the Court of Appeals' first judgment "[t]he parties agreed and advised the district court that the respondent's damages claim could be severed from his effort to obtain equitable relief." Brief for Petitioner 8, n. 7. Respondent does not suggest otherwise. This case, therefore, as it came to us, is on all fours with *O'Shea* and should be judged as such.

another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner. Although Count V alleged that the City authorized the use of the control holds in situations where deadly force was not threatened, it did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy. If, for example, chokeholds were authorized to be used only to counter resistance to an arrest by a suspect, or to thwart an effort to escape, any future threat to Lyons from the City's policy or from the conduct of police officers would be no more real than the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation.[7]

---

[7] The centerpiece of JUSTICE MARSHALL's dissent is that Lyons had standing to challenge the City's policy because to recover damages he would have to prove that what allegedly occurred on October 6, 1976, was pursuant to city authorization. We agree completely that for Lyons to succeed in his damages action, it would be necessary to prove that what happened to him—that is, as alleged, he was choked without any provocation or legal excuse whatsoever—was pursuant to a city policy. For several reasons, however, it does not follow that Lyons had standing to seek the injunction prayed for in Count V.

First, Lyons alleges in Count II of his first amended complaint that on October 6, 1976, the officers were carrying out official policies of the City. That allegation was incorporated by reference in Count V. That policy, however, is described in paragraphs 20 and 23 of Count V as authorizing the use of chokeholds "in situations where [the officers] are threatened by far less than deadly force." This is not equivalent to the unbelievable assertion that the City either orders or authorizes application of the chokeholds where there is no resistance or other provocation.

Second, even if such an allegation is thought to be contained in the complaint, it is belied by the record made on the application for preliminary injunction.

Under *O'Shea* and *Rizzo*, these allegations were an insufficient basis to provide a federal court with jurisdiction to entertain Count V of the complaint.[8]   This was apparently the conclusion of the District Court in dismissing Lyons' claim for injunctive relief.   Although the District Court acted without opinion or findings, the Court of Appeals interpreted its action as based on lack of standing, *i. e.*, that under *O'Shea* and *Rizzo*, Lyons must be held to have made an "insufficient showing that the police were likely to do this to the plaintiff again."   615 F. 2d, at 1246.   For several reasons—each of them infirm, in our view—the Court of Appeals thought reliance on *O'Shea* and *Rizzo* was misplaced and reversed the District Court.

First, the Court of Appeals thought that Lyons was more immediately threatened than the plaintiffs in those cases since, according to the Court of Appeals, Lyons need only

---

Third, even if the complaint must be read as containing an allegation that officers are authorized to apply the chokeholds where there is no resistance or other provocation, it does not follow that Lyons has standing to seek an injunction against the application of the restraint holds in situations that he has not experienced, as for example, where the suspect resists arrest or tries to escape but does not threaten the use of deadly force.   Yet that is precisely the scope of the injunction that Lyons prayed for in Count V.

Fourth, and in any event, to have a case or controversy with the City that could sustain Count V, Lyons would have to credibly allege that he faced a realistic threat from the future application of the City's policy. JUSTICE MARSHALL nowhere confronts this requirement—the necessity that Lyons demonstrate that he, himself, will not only again be stopped by the police but will also be choked without any provocation or legal excuse. JUSTICE MARSHALL plainly does not agree with that requirement, and he was in dissent in *O'Shea* v. *Littleton*.   We are at issue in that respect.

[8] As previously indicated, *supra*, at 98, Lyons alleged that he feared he would be choked in any future encounter with the police.   The reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct.   It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.   The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.   Of course, emotional upset is a relevant consideration in a damages action.

be stopped for a minor traffic violation to be subject to the strangleholds. But even assuming that Lyons would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert, and the complaint made no such allegation, that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped. We cannot agree that the "odds," 615 F. 2d, at 1247, that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief. We note that five months elapsed between October 6, 1976, and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.

Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim. As we have said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse. And it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.

Second, the Court of Appeals viewed *O'Shea* and *Rizzo* as cases in which the plaintiffs sought "massive structural" relief against the local law enforcement systems and therefore that the holdings in those cases were inapposite to cases such as this where the plaintiff, according to the Court of Appeals, seeks to enjoin only an "established," "sanctioned" police practice assertedly violative of constitutional rights. *O'Shea* and *Rizzo*, however, cannot be so easily confined to their

facts. If Lyons has made no showing that he is realistically threatened by a repetition of his experience of October 1976, then he has not met the requirements for seeking an injunction in a federal court, whether the injunction contemplates intrusive structural relief or the cessation of a discrete practice.

The Court of Appeals also asserted that Lyons "had a live and active claim" against the City "if only for a period of a few seconds" while the stranglehold was being applied to him and that for two reasons the claim had not become moot so as to disentitle Lyons to injunctive relief: First, because under normal rules of equity, a case does not become moot merely because the complained of conduct has ceased; and second, because Lyons' claim is "capable of repetition but evading review" and therefore should be heard. We agree that Lyons had a live controversy with the City. Indeed, he still has a claim for damages against the City that appears to meet all Art. III requirements. Nevertheless, the issue here is not whether that claim has become moot but whether Lyons meets the preconditions for asserting an injunctive claim in a federal forum. The equitable doctrine that cessation of the challenged conduct does not bar an injunction is of little help in this respect, for Lyons' lack of standing does not rest on the termination of the police practice but on the speculative nature of his claim that he will again experience injury as the result of that practice even if continued.

The rule that a claim does not become moot where it is capable of repetition, yet evades review, is likewise inapposite. Lyons' claim that he was illegally strangled remains to be litigated in his suit for damages; in no sense does that claim "evade" review. Furthermore, the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality. *DeFunis* v. *Odegaard,* 416 U. S. 312, 319 (1974). As we have indicated, Lyons has not made this demonstration.

The record and findings made on remand do not improve Lyons' position with respect to standing. The District Court, having been reversed, did not expressly address Lyons' standing to seek injunctive relief, although the City was careful to preserve its position on this question. There was no finding that Lyons faced a real and immediate threat of again being illegally choked. The City's policy was described as authorizing the use of the strangleholds "under circumstances where no one is threatened with death or grievous bodily harm." That policy was not further described, but the record before the court contained the department's existing policy with respect to the employment of chokeholds. Nothing in that policy, contained in a Police Department manual, suggests that the chokeholds, or other kinds of force for that matter, are authorized absent some resistance or other provocation by the arrestee or other suspect.[9] On the contrary, police officers were instructed to use chokeholds only when lesser degrees of force do not suffice and then only "to gain control of a suspect who is violently resisting the officer or trying to escape." App. 230.

Our conclusion is that the Court of Appeals failed to heed *O'Shea, Rizzo,* and other relevant authority, and that the District Court was quite right in dismissing Count V.

---

[9] The dissent notes that a LAPD training officer stated that the police are authorized to employ the control holds whenever an officer "feels" that there is about to be a bodily attack. *Post,* at 118. The dissent's emphasis on the word *"feels"* apparently is intended to suggest that LAPD officers are authorized to apply the holds whenever they "feel" like it. If there is a distinction between permitting the use of the holds when there is a "threat" of serious bodily harm, and when the officer "feels" or believes there is about to be a bodily attack, the dissent has failed to make it clear. The dissent does not, because it cannot, point to any written or oral pronouncement by the LAPD or any evidence showing a pattern of police behavior that would indicate that the official policy would permit the application of the control holds on a suspect who was not offering, or threatening to offer, physical resistance.

## V

Lyons fares no better if it be assumed that his pending damages suit affords him Art. III standing to seek an injunction as a remedy for the claim arising out of the October 1976 events. The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a "likelihood of substantial and immediate irreparable injury." *O'Shea* v. *Littleton*, 414 U. S., at 502. The speculative nature of Lyons' claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.

Nor will the injury that Lyons allegedly suffered in 1976 go unrecompensed; for that injury, he has an adequate remedy at law. Contrary to the view of the Court of Appeals, it is not at all "difficult" under our holding "to see how anyone can ever challenge police or similar administrative practices." 615 F. 2d, at 1250. The legality of the violence to which Lyons claims he was once subjected is at issue in his suit for damages and can be determined there.

Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional. Cf. *Warth* v. *Seldin*, 422 U. S. 490 (1975); *Schlesinger* v. *Reservists to Stop the War*, 418 U. S. 208 (1974); *United States* v. *Richardson*, 418 U. S. 166 (1974). This is not to suggest that such undifferentiated claims should not be taken seriously by local authorities. Indeed, the interest of an alert and interested citizen is an essential element of an effective and fair government, whether on the local, state, or national level.[10] A federal court, how-

---

[10] The City's memorandum suggesting a question of mootness informed the Court that the use of the control holds had become "a major civic con-

ever, is not the proper forum to press such claims unless the requirements for entry and the prerequisites for injunctive relief are satisfied.

We decline the invitation to slight the preconditions for equitable relief; for as we have held, recognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate. *O'Shea, supra,* at 499; *Younger* v. *Harris,* 401 U. S. 37, 46 (1971). *Mitchum* v. *Foster,* 407 U. S. 225 (1972), held that suits brought under 42 U. S. C. § 1983 are exempt from the flat ban against the issuance of injunctions directed at state-court proceedings, 28 U. S. C. § 2283. But this holding did not displace the normal principles of equity, comity, and federalism that should inform the judgment of federal courts when asked to oversee state law enforcement authorities. In exercising their equitable powers federal courts must recognize "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Stefanelli* v. *Minard,* 342 U. S. 117, 120 (1951); *O'Shea* v. *Littleton, supra,* at 500. See also *Rizzo* v. *Goode,* 423 U. S., at 380; *Cleary* v. *Bolger,* 371 U. S. 392 (1963); *Wilson* v. *Schnettler,* 365 U. S. 381 (1961); *Pugach* v. *Dollinger,* 365 U. S. 458 (1961). The Court of Appeals failed to apply these factors properly and therefore erred in finding that the District Court had not abused its discretion in entering an injunction in this case.

As we noted in *O'Shea,* 414 U. S., at 503, withholding injunctive relief does not mean that the "federal law will exer-

troversy" and that in April and May 1982 "a spirited, vigorous, and at times emotional debate" on the issue took place. The result was the current moratorium on the use of the holds.

cise no deterrent effect in these circumstances." If Lyons has suffered an injury barred by the Federal Constitution, he has a remedy for damages under § 1983. Furthermore, those who deliberately deprive a citizen of his constitutional rights risk conviction under the federal criminal laws. *Ibid.*

Beyond these considerations the state courts need not impose the same standing or remedial requirements that govern federal-court proceedings. The individual States may permit their courts to use injunctions to oversee the conduct of law enforcement authorities on a continuing basis. But this is not the role of a federal court, absent far more justification than Lyons has proffered in this case.

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The District Court found that the city of Los Angeles authorizes its police officers to apply life-threatening chokeholds to citizens who pose no threat of violence, and that respondent, Adolph Lyons, was subjected to such a chokehold. The Court today holds that a federal court is without power to enjoin the enforcement of the city's policy, no matter how flagrantly unconstitutional it may be. Since no one can show that he will be choked in the future, no one—not even a person who, like Lyons, has almost been choked to death—has standing to challenge the continuation of the policy. The city is free to continue the policy indefinitely as long as it is willing to pay damages for the injuries and deaths that result. I dissent from this unprecedented and unwarranted approach to standing.

There is plainly a "case or controversy" concerning the constitutionality of the city's chokehold policy. The constitutionality of that policy is directly implicated by Lyons' claim for damages against the city. The complaint clearly alleges

that the officer who choked Lyons was carrying out an official policy, and a municipality is liable under 42 U. S. C. § 1983 for the conduct of its employees only if they acted pursuant to such a policy. *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 694 (1978). Lyons therefore has standing to challenge the city's chokehold policy and to obtain whatever relief a court may ultimately deem appropriate. None of our prior decisions suggests that his requests for particular forms of relief raise any additional issues concerning his standing. Standing has always depended on whether a plaintiff has a "personal stake in the outcome of the controversy," *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), not on the "precise nature of the relief sought." *Jenkins* v. *McKeithen,* 395 U. S. 411, 423 (1969) (opinion of MARSHALL, J., joined by Warren, C. J., and BRENNAN, J.).

## I

## A

Respondent Adolph Lyons is a 24-year-old Negro male who resides in Los Angeles. According to the uncontradicted evidence in the record,[1] at about 2 a. m. on October 6, 1976, Lyons was pulled over to the curb by two officers of the Los Angeles Police Department (LAPD) for a traffic infraction because one of his taillights was burned out. The officers greeted him with drawn revolvers as he exited from his car. Lyons was told to face his car and spread his legs. He did so. He was then ordered to clasp his hands and put them on top of his head. He again complied. After one of the officers completed a patdown search, Lyons dropped his hands,

---

[1] The following summary of the evidence is taken from Lyons' deposition and his "Notice of Application and Application for Preliminary Injunction and Declaratory Relief; Points and Authorities," pp. 3–4. Although petitioner's answer contains a general denial of the allegations set forth in the complaint, petitioner has never presented any evidence to challenge Lyons' account. Brief for Petitioner 8.

but was ordered to place them back above his head, and one of the officers grabbed Lyons' hands and slammed them onto his head. Lyons complained about the pain caused by the ring of keys he was holding in his hand. Within 5 to 10 seconds, the officer began to choke Lyons by applying a forearm against his throat. As Lyons struggled for air, the officer handcuffed him, but continued to apply the chokehold until he blacked out. When Lyons regained consciousness, he was lying face down on the ground, choking, gasping for air, and spitting up blood and dirt. He had urinated and defecated. He was issued a traffic citation and released.

On February 7, 1977, Lyons commenced this action under 42 U. S. C. § 1983 against the individual officers and the city, alleging violations of his rights under the Fourth, Eighth, and Fourteenth Amendments to the Constitution and seeking damages and declaratory and injunctive relief. He claimed that he was subjected to a chokehold without justification and that defendant officers were "carrying out the official policies, customs and practices of the Los Angeles Police Department and the City of Los Angeles." Count II, ¶ 13.[2] These allegations were included or incorporated in each of the Counts in which the city was named as a defendant. See Counts II through VI. Lyons alleged that the city authorizes the use of chokeholds "in innumerable situations where [the police] are not threatened by the use of any deadly force whatsoever." Count V, ¶ 22.

### B

Although the city instructs its officers that use of a chokehold does not constitute deadly force, since 1975 no less than 16 persons have died following the use of a chokehold by

---

[2] Count I of the first amended complaint also stated a claim against the individual officers for damages. ¶ 8.

an LAPD police officer.   Twelve have been Negro males.[3]
The evidence submitted to the District Court[4] established
that for many years it has been the official policy of the city to
permit police officers to employ chokeholds in a variety of
situations where they face no threat of violence.   In reported
"altercations" between LAPD officers and citizens the choke-
holds are used more frequently than any other means of
physical restraint.[5]   Between February 1975 and July 1980,
LAPD officers applied chokeholds on at least 975 occasions,
which represented more than three-quarters of the reported
altercations.[6]

It is undisputed that chokeholds pose a high and unpredict-
able risk of serious injury or death.   Chokeholds are in-
tended to bring a subject under control by causing pain and
rendering him unconscious.   Depending on the position of
the officer's arm and the force applied, the victim's voluntary

---

[3] Thus in a city where Negro males constitute 9% of the population, they
have accounted for 75% of the deaths resulting from the use of chokeholds.
In addition to his other allegations, Lyons alleged racial discrimination in
violation of the Equal Protection Clause of the Fourteenth Amendment.
¶¶ 10, 15, 23, 24, 25, 30.

Of the 16 deaths, 10 occurred prior to the District Court's issuance of the
preliminary injunction, although at that time the parties and the court
were aware of only 9.   On December 24, 1980, the Court of Appeals stayed
the preliminary injunction pending appeal.   Four additional deaths oc-
curred during the period prior to the grant of a further stay pending filing
and disposition of a petition for certiorari, 453 U. S. 1308 (1981) (REHN-
QUIST, J., in chambers), and two more deaths occurred thereafter.

[4] Lyons' motion for a preliminary injunction was heard on affidavits,
depositions, and government records.

[5] Statement of Officer Pascal K. Dionne (officer-in-charge of the Physical
Training and Self-Defense Unit of the LAPD), App. 240–241.

[6] Statement of Officer Pascal K. Dionne, id., at 259.   These figures un-
doubtedly understate the frequency of the use of chokeholds since, as Offi-
cer Dionne, a witness for the city, testified, the figures compiled do not
include all altercations between police officers and citizens.   Id., at 241.
Officer Dionne's statement does not define "altercation" and does not indi-
cate when "altercation reports" must be filed by an officer.

The city does not maintain a record of injuries to suspects.

or involuntary reaction, and his state of health, an officer may inadvertently crush the victim's larynx, trachea, or hyoid. The result may be death caused by either cardiac arrest or asphyxiation.[7] An LAPD officer described the reaction of a person to being choked as "do[ing] the chicken,"

[7] The physiological effects of the chokeholds were described as follows by Dr. A. Griswold, an expert in pathology (*id.*, at 364–367):

"From a medical point of view, the bar arm control is extremely dangerous in an unpredictable fashion. Pressure from a locked forearm across the neck sufficient to compress and close the trachea applied for a sufficient period of time to cause unconsciousness from asphyxia must, to an anatomical certainty, also result in . . . a very high risk of a fractured hyoid bone or crushed larynx. The risk is substantial, but at the same time, unpredictable.

"It depends for one thing on which vertical portion of the neck the forearm pressure is exerted. . . .

"Another factor contributing to unpredictability is the reaction of the victim. . . . [The] pressure exerted in a bar arm control . . . can result in a laryngeal spasm or seizure which simply shuts off the trachial air passage, leading to death by asphyxiation. Also, it must result in transmission to the brain of nerve messages that there is immediate, acute danger of death. This transmission immediately sets up a 'flight or flee' syndrome wherein the body reacts violently to save itself or escape. Adrenalin output increases enormously; blood oxygen is switched to muscles and strong, violent struggle ensues which is to a great extent involuntary. From a medical point of view, there would be no way to distinguish this involuntary death struggle from a wilful, voluntary resistance. Thus, an instruction to cease applying the hold when 'resistance ceases' is meaningless.

"This violent struggle . . . increases the risk of permanent injury or death to the victim. This reserve may already be in a state of reduction by reason of cardiac, respiratory or other disease.

"The LAPD [operates under a] misconception . . . that the length of time for applying the hold is the sole measure of risk. This is simply not true. If sufficient force is applied, the larynx can be crushed or hyoid fractured with death ensuing, in seconds. An irreversible laryngeal spasm can also occur in seconds.

"From a medical point of view, the carotid control is extremely dangerous in a manner that is at least as equally unpredictable as the bar arm control.

". . . When applied with sufficient pressure, this control will crush the carotid sheath against the bony structure of the neck, foreseeably shutting

Exh. 44, p. 93, in reference apparently to the reactions of a chicken when its neck is wrung. The victim experiences extreme pain. His face turns blue as he is deprived of oxygen, he goes into spasmodic convulsions, his eyes roll back, his body wriggles, his feet kick up and down, and his arms move about wildly.

Although there has been no occasion to determine the precise contours of the city's chokehold policy, the evidence submitted to the District Court provides some indications. LAPD Training Officer Terry Speer testified that an officer is authorized to deploy a chokehold whenever he *"feels* that there's about to be a bodily attack made on him."  App. 381 (emphasis added). A training bulletin states that "[c]ontrol holds . . . allow officers to subdue *any* resistance by the suspects."  Exh. 47, p. 1 (emphasis added). In the proceedings below the city characterized its own policy as authorizing the use of chokeholds "'to gain control of a suspect who is violently resisting the officer *or trying to escape,'*" to "subdue *any* resistance by the suspects,"[8] and to permit an officer, "where . . . resisted, but *not necessarily threatened with serious bodily harm or death,* . . . to subdue a suspect who forcibly resists an officer."  (Emphasis added.)[9]

The training given LAPD officers provides additional revealing evidence of the city's chokehold policy.  Officer

down the supply of oxygenated blood to the brain and leading to unconsciousness in approximately 10 to 15 seconds.

"However, pressure on both carotid sheaths also results in pressure, if inadvertent or unintended, on both of the vagus nerves.  The vagus nerves (right and left) arise in the brain and are composed of both sensory and motor fibers. . . . Stimulation of these nerves by pressure can activate reflexes within the vagus system that can result in immediate heart stoppage (cardiac arrest). . . . There is also evidence that cardiac arrest can result from simultaneous pressure on both vagus nerves regardless of the intensity or duration of the pressure."

[8] City's Opposition to Application for Preliminary Injunction, No. 77–0420 (CD Cal.), pp. 26, 30.

[9] Brief in Opposition to Motion to Stay, in No. A–230 (CD Cal.), p. 4.

Speer testified that in instructing officers concerning the use of force, the LAPD does not distinguish between felony and misdemeanor suspects. App. 379. Moreover, the officers are taught to maintain the chokehold until the suspect goes limp, *id.*, at 387; App. to Pet. for Cert. 51a, despite substantial evidence that the application of a chokehold invariably induces a "flight or flee" syndrome, producing an *involuntary* struggle by the victim which can easily be misinterpreted by the officer as willful resistance that must be overcome by prolonging the chokehold and increasing the force applied. See n. 7, *supra.* In addition, officers are instructed that the chokeholds can be safely deployed for up to three or four minutes. App. 387–388; App. to Pet. for Cert. 48. Robert Jarvis, the city's expert who has taught at the Los Angeles Police Academy for the past 12 years, admitted that officers are never told that the bar-arm control can cause death if applied for just two seconds. App. 388. Of the nine deaths for which evidence was submitted to the District Court, the average duration of the choke where specified was approximately 40 seconds.

## C

In determining the appropriateness of a preliminary injunction, the District Court recognized that the city's policy is subject to the constraints imposed by the Due Process Clause of the Fourteenth Amendment. The court found that "[d]uring the course of this confrontation, said officers, without provocation or legal justification, applied a *Department-authorized* chokehold which resulted in injuries to plaintiff." (Emphasis added.) The court found that the "City of Los Angeles and the Department authorize the use of these holds under circumstances where no one is threatened by death or grievous bodily harm." The court concluded that the use of the chokeholds constitutes "deadly force," and that the city may not constitutionally authorize the use of such force "in situations where death or serious bodily harm is not threatened." On the basis of this conclusion, the District Court en-

120

tered a preliminary injunction enjoining "the use of both the carotid-artery and bar arm holds under circumstances which do not threaten death or serious bodily injury." [10]   As the Court of Appeals noted, "[a]ll the trial judge has done, so far, is to tell the city that its police officers may not apply life threatening strangleholds to persons stopped in routine police work unless the application of such force is necessary to prevent serious bodily harm to an officer."   656 F. 2d 417, 418 (1981).

## II

At the outset it is important to emphasize that Lyons' entitlement to injunctive relief and his entitlement to an award of damages both depend upon whether he can show that the city's chokehold policy violates the Constitution.   An indispensable prerequisite of municipal liability under 42 U. S. C. § 1983 is proof that the conduct complained of is attributable to an unconstitutional official policy or custom.   *Polk County* v. *Dodson*, 454 U. S. 312, 326 (1981); *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 694.   It is not enough for a § 1983 plaintiff to show that the employees or agents of a municipality have violated or will violate the Constitution, for a municipality will not be held liable solely on a theory of *respondeat superior*.   See *Monell, supra,* at 694.

The Court errs in suggesting that Lyons' prayer for injunctive relief in Count V of his first amended complaint concerns a policy that was not responsible for his injuries and that therefore could not support an award of damages.   *Ante,* at 106–107, n. 7.   Paragraph 8 of the complaint alleges that Lyons was choked "without provocation, legal justification or ex-

---

[10] The preliminary injunction provided that the city itself could lift the injunction by obtaining court approval of a training program, and also required the city to keep records of all uses of chokeholds and to make those records available.

The District Court refrained from determining the precise nature of the city's policy given the limited nature of its inquiry at the preliminary injunction stage.   *Brown* v. *Chote*, 411 U. S. 452, 456 (1973).

cuse." Paragraph 13 expressly alleges that "[t]he Defendant Officers were carrying out *the official policies, customs and practices* of the Los Angeles Police Department and the City of Los Angeles," and that *"by virtue thereof,* defendant City is liable for the actions" of the officers. (Emphasis added.) These allegations are incorporated in each of the Counts against the city, including Count V.

There is no basis for the Court's assertion that Lyons has failed to allege "that the City either orders or authorizes application of the chokeholds where there is no resistance or other provocation." *Ante,* at 106, n. 7. I am completely at a loss to understand how paragraphs 8 and 13 can be deemed insufficient to allege that the city's policy authorizes the use of chokeholds without provocation. The Court apparently finds Lyons' complaint wanting because, although it alleges that he was choked without provocation and that the officers acted pursuant to an official policy, it fails to allege *in haec verba* that the city's policy authorizes the choking of suspects without provocation. I am aware of no case decided since the abolition of the old common-law forms of action, and the Court cites none, that in any way supports this crabbed construction of the complaint. A federal court is capable of concluding for itself that two plus two equals four.[11]

The Court also errs in asserting that even if the complaint sufficiently alleges that the city's policy authorizes the use of chokeholds without provocation, such an allegation is in any event "belied by the record made on the application for preliminary injunction." *Ibid.* This conclusion flatly contradicts the District Court's express factual finding, which was left undisturbed by the Court of Appeals, that the officers applied a *"Department-authorized* chokehold which resulted in

---

[11] Contrary to the Court's suggestion, *ante,* at 106–107, n. 7, there is clearly no inconsistency between the allegation in paragraph 8 of the complaint that Lyons was choked "without provocation, legal justification or excuse," and the allegations that the city authorizes chokeholds "in situations where [officers] are threatened by far less than deadly force." ¶¶ 20, 23.

injuries to plaintiff." (Emphasis added.) The city does not contend that this factual finding is clearly erroneous.[12]

In sum, it is absolutely clear that Lyons' requests for damages and for injunctive relief call into question the constitutionality of the city's policy concerning the use of chokeholds. If he does not show that that policy is unconstitutional, he will be no more entitled to damages than to an injunction.

### III

Since Lyons' claim for damages plainly gives him standing, and since the success of that claim depends upon a demonstration that the city's chokehold policy is unconstitutional, it is beyond dispute that Lyons has properly invoked the District Court's authority to adjudicate the constitutionality of the city's chokehold policy. The dispute concerning the constitutionality of that policy plainly presents a "case or controversy" under Art. III. The Court nevertheless holds that a federal court has no power under Art. III to adjudicate Lyons' request, in the same lawsuit, for injunctive relief with respect to that very policy. This anomalous result is not supported either by precedent or by the fundamental concern underlying the standing requirement. Moreover, by fragmenting a single claim into multiple claims for particular types of relief and requiring a separate showing of standing for each form of relief, the decision today departs from this

[12] Even if the issue were properly before us, I could not agree that this Court should substitute its judgment for that of the District Court. One of the city's own training officers testified that an officer is authorized to use a chokehold whenever he "feels that there's about to be a bodily attack made on him." App. 381. This testimony indicates that an officer is authorized to use a chokehold whenever he subjectively perceives a threat, regardless of whether the suspect has done anything to provide an objective basis for such a perception. The District Court's finding is not refuted by the statement of the city's policy which is set forth in an LAPD manual, *ante*, at 110, for municipal liability under § 1983 may be predicated on proof of an official custom whether or not that custom is embodied in a formal policy. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 694 (1978).

Court's traditional conception of standing and of the remedial powers of the federal courts.

## A

It is simply disingenuous for the Court to assert that its decision requires "[n]o extension" of *O'Shea* v. *Littleton*, 414 U. S. 488 (1974), and *Rizzo* v. *Goode*, 423 U. S. 362 (1976). *Ante*, at 105. In contrast to this case *O'Shea* and *Rizzo* involved disputes focusing solely on the threat of future injury which the plaintiffs in those cases alleged they faced. In *O'Shea* the plaintiffs did not allege past injury and did not seek compensatory relief.[13] In *Rizzo*, the plaintiffs sought only declaratory and injunctive relief and alleged past instances of police misconduct only in an attempt to establish the substantiality of the threat of future injury. There was similarly no claim for damages based on past injuries in *Ashcroft* v. *Mattis*, 431 U. S. 171 (1977), or *Golden* v. *Zwickler*, 394 U. S. 103 (1969),[14] on which the Court also relies.

---

[13] Although counsel for the plaintiffs in *O'Shea* suggested at oral argument that certain plaintiffs had been exposed to illegal conduct in the past, in fact "[n]o damages were sought against the petitioners . . . nor were any specific instances involving the individually named respondents set forth in the claim against these judicial officers." 414 U. S., at 492. The Court referred to the absence of past injury repeatedly. See *id.*, at 492, 495, and n. 3.

[14] The plaintiff in *Mattis* did originally seek damages, but after the District Court found that the defendant officers were shielded by the good-faith immunity, he pursued only prospective relief. Although we held that the case had been mooted by the elimination of the damages claim, we in no way suggested that the plaintiff's requests for declaratory and injunctive relief could not have been entertained had his damages claim remained viable. We held only that where a plaintiff's "primary claim of a present interest in the controversy is that he will obtain emotional satisfaction from a ruling that his son's death was wrongful," 431 U. S., at 172 (footnote omitted), he does not have the personal stake in the outcome required by Art. III. In *Zwickler* the plaintiff did not even allege that he would or might run for office again; he merely asserted that he "can be 'a candidate for Congress again.'" 394 U. S., at 109. We held that this mere logical possibility was insufficient to present an actual controversy.

These decisions do not support the Court's holding today. As the Court recognized in *O'Shea*, standing under Art. III is established by an allegation of " 'threatened *or* actual injury.' " 414 U. S., at 493, quoting *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617 (1973) (emphasis added). See also 414 U. S., at 493, n. 2. Because the plaintiffs in *O'Shea, Rizzo, Mattis,* and *Zwickler* did not seek to redress past injury, their standing to sue depended entirely on the risk of future injury they faced. Apart from the desire to eliminate the possibility of future injury, the plaintiffs in those cases had no other personal stake in the outcome of the controversies.

By contrast, Lyons' request for prospective relief is coupled with his claim for damages based on past injury. In addition to the risk that he will be subjected to a chokehold in the future, Lyons has suffered past injury.[15] Because he has a live claim for damages, he need not rely solely on the threat of future injury to establish his personal stake in the outcome of the controversy.[16] In the cases relied on by the majority,

---

[15] In *Lankford* v. *Gelston*, 364 F. 2d 197 (1966) (en banc), which we cited with approval in *Allee* v. *Medrano*, 416 U. S. 802, 816, n. 9 (1974), the Fourth Circuit found standing on facts indistinguishable from this case. In *Lankford,* the Court of Appeals held that four Negro families who had been subjected to an illegal house search were entitled to seek injunctive relief against the Baltimore Police Department's policy of conducting wholesale searches based only on uncorroborated anonymous tips, even though the plaintiffs there did not claim that they were more likely than other Negro residents of the city to be subjected to an illegal search in the future.

[16] In *O'Shea* itself the Court suggested that the absence of a damages claim was highly pertinent to its conclusion that the plaintiff had no standing. The Court noted that plaintiffs' "claim for relief against the State's Attorney[,] where specific instances of misconduct with respect to particular individuals *are* alleged," 414 U. S., at 495 (emphasis added), stood in "sharp contrast" to their claim for relief against the magistrate and judge, which did not contain similar allegations. The plaintiffs did seek damages against the State's Attorney. See *Spomer* v. *Littleton*, 414 U. S. 514, 518, n. 5 (1974). Like the claims against the State's Attorney in *O'Shea*, Lyons' claims against the city allege both past injury and the risk of future injury. Whereas in *O'Shea* the Court acknowledged the significance for standing

the Court simply had no occasion to decide whether a plaintiff who has standing to litigate a dispute must clear a separate standing hurdle with respect to each form of relief sought.[17]

## B

The Court's decision likewise finds no support in the fundamental policy underlying the Art. III standing requirement—the concern that a federal court not decide a legal issue if the plaintiff lacks a sufficient "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker* v. *Carr*, 369 U. S., at 204. As this Court stated in *Flast* v. *Cohen*, 392 U. S. 83, 101 (1968), "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." See also *Valley Forge Christian College* v.

---

purposes of past injury, the Court today inexplicably treats Lyons' past injury for which he is seeking redress as wholly irrelevant to the standing inquiry before us.

[17] The Court's reliance on *Rizzo* is misplaced for another reason. In *Rizzo* the Court concluded that the evidence presented at trial failed to establish an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [defendants]." 423 U. S., at 371. Because the misconduct being challenged was, in the Court's view, the result of the behavior of unidentified officials not named as defendants rather than any policy of the named defendants—the City Managing Director, and the Police Commissioner, *id.*, at 372—the Court had "serious doubts" whether a case or controversy existed between the plaintiffs and those defendants. Here, by contrast, Lyons has clearly established a case or controversy between himself and the city concerning the constitutionality of the city's policy. See *supra*, at 120–122. In *Rizzo* the Court specifically distinguished those cases where a case or controversy was found to exist because of the existence of an official policy responsible for the past or threatened constitutional deprivations. 423 U. S., at 373–374, distinguishing *Hague* v. *CIO*, 307 U. S. 496 (1939); *Allee* v. *Medrano*, 416 U. S. 802 (1974); *Lankford* v. *Gelston*, *supra*.

*Americans United for Separation of Church and State*, 454
U. S. 464, 472 (1982) (standing requirement ensures that "the
legal questions presented to the court will be resolved, not in
the rarified atmosphere of a debating society, but in a con-
crete factual context conducive to a realistic appreciation of
the consequences of judicial action").

Because Lyons has a claim for damages against the city,
and because he cannot prevail on that claim unless he demon-
strates that the city's chokehold policy violates the Constitu-
tion, his personal stake in the outcome of the controversy ad-
equately assures an adversary presentation of his challenge
to the constitutionality of the policy.[18]   Moreover, the resolu-
tion of this challenge will be largely dispositive of his re-
quests for declaratory and injunctive relief.   No doubt the
requests for injunctive relief may raise additional questions.
But these questions involve familiar issues relating to the
appropriateness of particular forms of relief, and have never
been thought to implicate a litigant's standing to sue.   The
denial of standing separately to seek injunctive relief there-
fore cannot be justified by the basic concern underlying the
Art. III standing requirement.[19]

---

[18] It is irrelevant that the District Court has severed Lyons' claim for
damages from his claim for injunctive relief.   *Ante*, at 105, n. 6.   If the
District Court, in deciding whether to issue an injunction, upholds the
city's policy against constitutional attack, this ruling will be res judicata
with respect to Lyons' claim for damages.   The severance of the claims
therefore does not diminish Lyons' incentive to establish the unconstitu-
tionality of the policy.

It is unnecessary to decide here whether the standing of a plaintiff who
alleges past injury that is legally redressable depends on whether he spe-
cifically seek damages.   See *Lankford* v. *Gelston, supra* (plaintiffs who did
not seek damages permitted to seek injunctive relief based on past injury).
See n. 15, *supra*.

[19] The Court errs in asserting that Lyons has no standing to seek injunc-
tive relief because the injunction prayed for in Count V reaches suspects
who, unlike Lyons, offer resistance or attempt to escape.   *Ante*, at 106–
107, n. 7.   Even if a separate inquiry into Lyons' standing to seek injunc-
tive relief as opposed to damages were appropriate, and even if he had no

## C

By fragmenting the standing inquiry and imposing a separate standing hurdle with respect to each form of relief sought, the decision today departs significantly from this Court's traditional conception of the standing requirement and of the remedial powers of the federal courts.  We have never required more than that a plaintiff have standing to litigate a claim.  Whether he will be entitled to obtain particular forms of relief should he prevail has never been understood to be an issue of standing.  In determining whether a plaintiff has standing, we have always focused on his personal stake in the outcome of the controversy, not on the issues sought to be litigated, *Flast* v. *Cohen, supra,* at 99, or the "precise nature of the relief sought." *Jenkins* v. *McKeithen,* 395 U. S., at 423 (opinion of MARSHALL, J., joined by Warren, C. J., and BRENNAN, J.).

---

standing to seek the entire injunction he requests, it would not follow that he had no standing to seek any injunctive relief.  Even under the Court's view, Lyons presumably would have standing to seek to enjoin the use of chokeholds without provocation.  There would therefore be no justification for reversing the judgment below in its entirety.

The Court's reliance on the precise terms of the injunction sought in Count V is also misplaced for a more fundamental reason.  Whatever may be said for the Court's novel rule that a separate showing of standing must be made for each form of relief requested, the Court is simply wrong in assuming that the scope of the injunction prayed for raises a question of standing.  A litigant is entitled to advance any substantive legal theory which would entitle him to relief.  Lyons' entitlement to relief may ultimately rest on the principle that a municipality may not authorize the use of chokeholds absent a threat of deadly force.  This principle, which the District Court tentatively embraced in issuing the preliminary injunction, would support the entire injunction sought in Count V.  Alternatively, Lyons' entitlement to relief may rest on some narrower theory.  If Lyons prevails, the appropriateness of the injunction prayed for in Count V will depend on the legal principle upon which the District Court predicates its decision.  It may well be judicious for the District Court, in the exercise of its discretion, to rest its decision on a theory that would not support the full scope of the injunction that Lyons requests.  But this has nothing whatsoever to do with Lyons' standing.

1

Our cases uniformly state that the touchstone of the Art. III standing requirement is the plaintiff's personal stake in the underlying dispute, not in the particular types of relief sought. Once a plaintiff establishes a personal stake in a dispute, he has done all that is necessary to "invok[e] the court's authority . . . to challenge the action sought to be adjudicated." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, supra,* at 471–472. See, *e. g., Flast* v. *Cohen,* 392 U. S., at 101 (stake in "the dispute to be adjudicated in the lawsuit"); *Eisenstadt* v. *Baird,* 405 U. S. 438, 443 (1972) (plaintiff must have "sufficient interest in challenging the statute's validity").

The personal stake of a litigant depends, in turn, on whether he has alleged a legally redressable injury. In determining whether a plaintiff has a sufficient personal stake in the outcome of a controversy, this Court has asked whether he "personally has suffered some actual *or* threatened injury," *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 99 (1979) (emphasis added), whether the injury "fairly can be traced to the challenged action," *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 41 (1976), and whether plaintiff's injury "is likely to be redressed by a favorable decision." *Id.,* at 38. See also *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 74 (1978); *Warth* v. *Seldin,* 422 U. S. 490, 508 (1975). These well-accepted criteria for determining whether a plaintiff has established the requisite personal stake do not fragment the standing inquiry into a series of discrete questions about the plaintiff's stake in each of the particular types of relief sought. Quite the contrary, they ask simply whether the plaintiff has a sufficient stake in seeking a judicial resolution of the controversy.

Lyons has alleged past injury and a risk of future injury and has linked both to the city's chokehold policy. Under established principles, the only additional question in determin-

ing standing under Art. III is whether the injuries he has alleged can be remedied or prevented by *some* form of judicial relief. Satisfaction of this requirement ensures that the lawsuit does not entail the issuance of an advisory opinion without the possibility of any judicial relief, and that the exercise of a court's remedial powers will actually redress the alleged injury.[20] Therefore Lyons needs to demonstrate only that, should he prevail on the merits, "the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co., supra*, at 74. See also *Warth* v. *Seldin, supra*, at 508; *Simon, supra*, at 38. Lyons has easily made this showing here, for monetary relief would plainly provide redress for his past injury, and prospective relief would reduce the likelihood of any future injury. Nothing more has ever been required to establish standing.

The Court's decision turns these well-accepted principles on their heads by requiring a separate standing inquiry with

---

[20] This limited inquiry into remedy, which addresses two *jurisdictional* concerns, provides no support for the Court's requirement that standing be separately demonstrated with respect to each particular form of relief sought. First, a court must have the power to fashion *some* appropriate remedy. This concern, an aspect of the more general case-or-controversy requirement, reflects the view that the adjudication of rights which a court is powerless to enforce is tantamount to an advisory opinion. See *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 241 (1937) ("[The controversy] must be a real and substantial [one] *admitting of specific relief* through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts") (emphasis added). Second, a court must determine that there is an available remedy which will have a "substantial probability," *Warth* v. *Seldin*, 422 U. S. 490, 508 (1975), of redressing the plaintiff's injury. This latter concern is merely a recasting of the causal nexus, *supra*, at 128, that must exist between the alleged injury and the action being challenged, and ensures that the granting of judicial relief will not be an exercise in futility. See *Duke Power Co.* v. *Carolina Environmental Study Group*, 438 U. S. 59, 74 (1978). These considerations are summarized by the requirement that a plaintiff need only allege an injury that is "legally redressable." *Jenkins* v. *McKeithen*, 395 U. S. 411, 424 (1969) (emphasis added).

respect to each request for relief. Until now, questions concerning remedy were relevant to the threshold issue of standing only in the limited sense that some relief must be possible. The approach adopted today drastically alters the inquiry into remedy that must be made to determine standing.

2

The Court's fragmentation of the standing inquiry is also inconsistent with the way the federal courts have treated remedial issues since the merger of law and equity. The federal practice has been to reserve consideration of the appropriate relief until after a determination of the merits, not to foreclose certain forms of relief by a ruling on the pleadings. The prayer for relief is no part of the plaintiff's cause of action. See 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.18, p. 8–216, and n. 13 (1983) (Moore), and cases cited therein; C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2664 (1983) (Wright, Miller, & Kane). Rather, "[the usual rule is] that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood,* 327 U. S. 678, 684 (1946) (footnote omitted).

Rule 54(c) of the Federal Rules of Civil Procedure specifically provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." The question whether a plaintiff has stated a claim turns not on "whether [he] has asked for the proper remedy but whether he is entitled to *any* remedy." (Emphasis added.) Wright, Miller, & Kane § 2664. This is fully consistent with the approach taken in our standing cases. *Supra,* at 128–129 and this page, and n. 20.

The Court provides no justification for departing from the traditional treatment of remedial issues and demanding a separate threshold inquiry into each form of relief a plaintiff seeks. It is anomalous to require a plaintiff to demonstrate

"standing" to seek each particular form of relief requested in the complaint when under Rule 54(c) the remedy to which a party may be entitled need not even be demanded in the complaint.[21]  See *Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60, 65–66 (1978); *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 424 (1975).  The traditional federal practice is a sound one. Even if it appears highly unlikely at the outset of a lawsuit that a plaintiff will establish that he is entitled to a particular remedy, there are dangers inherent in any doctrine that permits a court to foreclose any consideration of that remedy by ruling on the pleadings that the plaintiff lacks standing to seek it.  A court has broad discretion to grant appropriate equitable relief to protect a party who has been injured by unlawful conduct, as well as members of the class, from future injury that may occur if the wrongdoer is permitted to continue his unlawful actions.  Where, as here, a plaintiff alleges both past injury and a risk of future injury and presents a concededly substantial claim that a defendant is implementing an unlawful policy, it will rarely be easy to decide with any certainty at the outset of a lawsuit that no equitable relief would be appropriate under any conceivable set of facts that he might establish in support of his claim.

In sum, the Court's approach to standing is wholly inconsistent with well-established standing principles and clashes with our longstanding conception of the remedial powers of a court and what is necessary to invoke the authority of a court to resolve a particular dispute.

IV

Apart from the question of standing, the only remaining question presented in the petition for certiorari is whether

---

[21] It is not clear from the Court's opinion whether the District Court is wholly precluded from granting *any* form of declaratory or injunctive relief, even if it ultimately holds that Lyons should prevail on his claim for damages against the city on the ground that the city's chokehold policy is unconstitutional and is responsible for his injury.

the preliminary injunction issued by the District Court must be set aside because it "constitute[s] a substantial interference in the operation of a municipal police department." Pet. for Cert. i.[22]   In my view it does not.

In the portion of its brief concerning this second question, the city argues that the District Court ignored the principles of federalism set forth in *Rizzo* v. *Goode*, 423 U. S. 362 (1976). Brief for Petitioner 40–47.   The city's reliance on *Rizzo* is misplaced.   That case involved an injunction which "significantly revis[ed] the internal procedures of the Philadelphia police department."   423 U. S., at 379.   The injunction required the police department to adopt "'a comprehensive program for dealing adequately with civilian complaints'" to be formulated in accordance with extensive "guidelines" established by the District Court.   *Id.*, at 369, quoting *Council of Organizations on Phila. Police A. & R.* v. *Rizzo*, 357 F. Supp. 1289, 1321 (1973).   Those guidelines specified detailed revisions of police manuals and rules of procedure, as well as the adoption of specific procedures for processing, screening, investigating, and adjudicating citizen complaints.   In addition, the District Court supervised the implementation of the comprehensive program, issuing detailed orders concerning the posting and distribution of the revised police procedures and the drawing up of a "Citizen's Complaint Report" in a format designated by the court.   The District Court also reserved jurisdiction to review the progress of the police department.   423 U. S., at 365, n. 2. This Court concluded that the sweeping nature of the injunctive relief was inconsistent with "the principles of federalism."   *Id.*, at 380.

---

[22] Question 1 of the petition raised the question of Lyons' standing. Question 2 of the petition states: "Does a federal court order constitute a substantial interference in the operation of a municipal police department where it (a) modifies policies concerning use of force and (b) takes control of such department's training and reporting systems relative to a particular force technique?"

The principles of federalism simply do not preclude the limited preliminary injunction issued in this case. Unlike the permanent injunction at issue in *Rizzo*, the preliminary injunction involved here entails no federal supervision of the LAPD's activities. The preliminary injunction merely forbids the use of chokeholds absent the threat of deadly force, permitting their continued use where such a threat does exist. This limited ban takes the form of a preventive injunction, which has traditionally been regarded as the least intrusive form of equitable relief. Moreover, the city can remove the ban by obtaining approval of a training plan. Although the preliminary injunction also requires the city to provide records of the uses of chokeholds to respondent and to allow the court access to such records, this requirement is hardly onerous, since the LAPD already maintains records concerning the use of chokeholds.

A district court should be mindful that "federal-court intervention in the daily operation of a large city's police department . . . is undesirable and to be avoided if at all possible." *Rizzo, supra*, at 381 (BLACKMUN, J., dissenting).[23] The modest interlocutory relief granted in this case differs markedly, however, from the intrusive injunction involved in *Rizzo*, and simply does not implicate the federalism concerns

---

[23] Of course, municipalities may be enjoined under § 1983, *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), and this Court has approved of the issuance of injunctions by federal courts against state or municipal police departments where necessary to prevent the continued enforcement of unconstitutional official policies. See, *e. g., Allee* v. *Medrano*, 416 U. S. 802 (1974); *Hague* v. *CIO*, 307 U. S. 496 (1939); *Lankford* v. *Gelston*, 364 F. 2d 197 (CA4 1966) (en banc), cited with approval in *Allee, supra*, at 816. Although federalism concerns are relevant in fashioning an appropriate relief, we have stated repeatedly that a federal court retains the power to order any available remedy necessary to afford full relief for the invasion of legal rights. See, *e. g., Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 14 (1971); *Bell* v. *Hood*, 327 U. S. 678, 684 (1946).

that arise when a federal court undertakes to "supervise the functioning of the police department." 423 U. S., at 380.

## V

Apparently because it is unwilling to rely solely on its unprecedented rule of standing, the Court goes on to conclude that, even if Lyons has standing, "[t]he equitable remedy is unavailable." *Ante*, at 111. The Court's reliance on this alternative ground is puzzling for two reasons.

If, as the Court says, Lyons lacks standing under Art. III, the federal courts have no power to decide his entitlement to equitable relief on the merits. Under the Court's own view of Art. III, the Court's discussion in Part V is purely an advisory opinion.

In addition, the question whether injunctive relief is available under equitable principles is simply not before us. We granted certiorari only to determine whether Lyons has standing and whether, if so, the preliminary injunction must be set aside because it constitutes an impermissible interference in the operation of a municipal police department. We did not grant certiorari to consider whether Lyons satisfies the traditional prerequisites for equitable relief. See n. 22, *supra*.

Even if the issue had been properly raised, I could not agree with the Court's disposition of it. With the single exception of *Rizzo* v. *Goode, supra*,[24] all of the cases relied on by the Court concerned injunctions against state criminal proceedings. The rule of *Younger* v. *Harris*, 401 U. S. 37 (1971), that such injunctions can be issued only in extraordinary circumstances in which the threat of injury is "great and immediate," *id.*, at 46, reflects the venerable rule that equity will not enjoin a criminal prosecution, the fact that constitu-

---

[24] As explained above, *Rizzo* v. *Goode* does not support a decision barring Lyons from obtaining any injunctive relief, for that case involved an injunction which entailed judicial supervision of the workings of a municipal police department, not simply the sort of preventive injunction that Lyons seeks. *Supra*, at 132–133.

tional defenses can be raised in such a state prosecution, and an appreciation of the friction that injunctions against state judicial proceedings may produce. See *ibid.; Steffel* v. *Thompson*, 415 U. S. 452, 462 (1974); 28 U. S. C. § 2283.

Our prior decisions have repeatedly emphasized that where an injunction is not directed against a state criminal or quasi-criminal proceeding, "the relevant principles of equity, comity, and federalism" that underlie the *Younger* doctrine "have little force." *Steffel* v. *Thompson, supra,* at 462, citing *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 509 (1972). Outside the special context in which the *Younger* doctrine applies, we have held that the appropriateness of injunctive relief is governed by traditional equitable considerations. See *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 930 (1975). Whatever the precise scope of the *Younger* doctrine may be, the concerns of comity and federalism that counsel restraint when a federal court is asked to enjoin a state criminal proceeding simply do not apply to an injunction directed solely at a police department.

If the preliminary injunction granted by the District Court is analyzed under general equitable principles, rather than the more stringent standards of *Younger* v. *Harris*, it becomes apparent that there is no rule of law that precludes equitable relief and requires that the preliminary injunction be set aside. "In reviewing such interlocutory relief, this Court may only consider whether issuance of the injunction constituted an abuse of discretion." *Brown* v. *Chote*, 411 U. S. 452, 457 (1973).

The District Court concluded, on the basis of the facts before it, that Lyons was choked without provocation pursuant to an unconstitutional city policy. *Supra*, at 119. Given the necessarily preliminary nature of its inquiry, there was no way for the District Court to know the precise contours of the city's policy or to ascertain the risk that Lyons, who had alleged that the policy was being applied in a discriminatory manner, might again be subjected to a chokehold. But in view of the Court's conclusion that the unprovoked choking of

Lyons was pursuant to a city policy, Lyons has satisfied "the usual basis for injunctive relief, 'that there exists some cognizable danger of recurrent violation.'" *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49, 59 (1975), quoting *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953). The risk of serious injuries and deaths to other citizens also supported the decision to grant a preliminary injunction. Courts of equity have much greater latitude in granting injunctive relief "in furtherance of the public interest than . . . when only private interests are involved." *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 552 (1937). See Wright, Miller, & Kane § 2948; 7 Moore ¶ 65.04[1]. In this case we know that the District Court would have been amply justified in considering the risk to the public, for after the preliminary injunction was stayed, five additional deaths occurred prior to the adoption of a moratorium. See n. 3, *supra*. Under these circumstances, I do not believe that the District Court abused its discretion.

Indeed, this Court has approved of a decision that directed issuance of a *permanent* injunction in a similar situation. See *Lankford* v. *Gelston*, 364 F. 2d 197 (CA4 1966), cited with approval in *Allee* v. *Medrano*, 416 U. S. 802, 816, n. 9 (1974). See n. 15, *supra.* In *Lankford,* citizens whose houses had been searched solely on the basis of uncorroborated, anonymous tips sought injunctive relief. The Fourth Circuit, sitting en banc, held that the plaintiffs were entitled to an injunction against enforcement of the police department policy authorizing such searches, even though there was no evidence that their homes would be searched in the future. Lyons is no less entitled to seek injunctive relief. To hold otherwise is to vitiate "one of the most valuable features of equity jurisdiction, to anticipate and prevent a threatened injury, where the damages would be insufficient or irreparable." *Vicksburg Waterworks Co.* v. *Vicksburg*, 185 U. S. 65, 82 (1902).

Here it is unnecessary to consider the propriety of a permanent injunction. The District Court has simply sought to protect Lyons and other citizens of Los Angeles pending a disposition of the merits. It will be time enough to consider the propriety of a permanent injunction when and if the District Court grants such relief.

## VI

The Court's decision removes an entire class of constitutional violations from the equitable powers of a federal court. It immunizes from prospective equitable relief any policy that authorizes persistent deprivations of constitutional rights as long as no individual can establish with substantial certainty that he will be injured, or injured again, in the future. THE CHIEF JUSTICE asked in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 419 (1971) (dissenting opinion), "what would be the judicial response to a police order authorizing 'shoot to kill' with respect to every fugitive"? His answer was that it would be "easy to predict our collective wrath and outrage." *Ibid.* We now learn that wrath and outrage cannot be translated into an order to cease the unconstitutional practice, but only an award of damages to those who are victimized by the practice and live to sue and to the survivors of those who are not so fortunate. Under the view expressed by the majority today, if the police adopt a policy of "shoot to kill," or a policy of shooting 1 out of 10 suspects, the federal courts will be powerless to enjoin its continuation. Cf. *Linda R. S.* v. *Richard D.*, 410 U. S., at 621 (WHITE, J., dissenting). The federal judicial power is now limited to levying a toll for such a systematic constitutional violation.