The NATIONAL ORGANIZATION FOR the REFORM OF MARIJUANA LAWS (NORML), a non-profit District of Columbia corporation, et al., Plaintiffs,

v.

Francis M. MULLEN, Jr., individually and in his official capacity as Director of the Drug Enforcement Administration et al., Defendants.

No. C 83–4037 RPA.

United States District Court, N.D. California.

April 12, 1985.

Ronald M. Sinoway, Inc., Miranda, Cal., R. Elaine Leitner, Keker & Brockett, Arthur M. Sohcot, San Francisco, Cal., Marshall W. Krause, Larkspur, Cal., for plaintiffs.

John F. Penrose, Asst. U.S. Atty., Joseph P. Russoniello, U.S. Atty., Thomas P. Dove, Deputy Atty. Gen., John K. Van de Kamp, Atty. Gen. of the State of Cal., San Francisco, Cal., for defendants.

## AMENDED ORDER GRANTING PRELIMINARY INJUNCTION AND DENYING STAY

AGUILAR, District Judge.

This is a purported class action brought by the National Organization for the Reform of Marijuana Laws (NORML), the Civil Liberties Monitoring Project, and ten residents of Northern California. The defendants are various state and federal officials and agencies involved in California's Campaign Against Marijuana Planting (CAMP). Presently before the Court is plaintiffs' motion to preliminarily enjoin CAMP activities.

CAMP is a sophisticated law enforcement program underway in 37 California counties to eradicate the state's thriving, and at times violent,[1] marijuana cultivation industry. CAMP's *modus operandi* is to use airplanes and helicopters to locate rural marijuana "gardens." Agents then obtain warrants and enter the parcels by land or by helicopter to destroy the crop. Helicopters are used to transport CAMP personnel to the gardens, which are often in roadless or remote areas, and to airlift the cut weed to burn sites. In its two years of operation CAMP has seized hundreds of thousands of pounds of cannibis valued at hundreds of millions of dollars. CAMP officials plan to continue the program in future growing seasons, and to adhere to current policies.

Plaintiffs do not dispute the legitimate government objectives of the CAMP program, but challenge CAMP's methods. Among the plaintiffs' contentions is that CAMP's air and ground activities violate plaintiffs' fourth amendment rights. Plaintiffs seek declaratory and injunctive relief, and damages pursuant to 42 U.S.C. § 1983 and the doctrine of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

One year ago this Court denied plaintiffs' request for a preliminary injunction against CAMP's use of high-altitude U–2 planes for surveillance of marijuana crops. The Court was troubled by such domestic use of spy planes, but found no clear support for the contention that these particular flights violated plaintiffs' constitutional rights.[2] The Court also indicated that the constitutional rights of some individuals may have been violated as a result of CAMP roadblocks and other activities, but found that the record did not show the persistent violations of any particular plain-

---

1. It is alleged that marijuana growers at times take extreme measures to protect their investment, setting booby traps and wielding weapons to ward off poachers and inadvertent trespassers.

2. There was no evidence that the U–2 planes were being used to look at anything other than open fields. *See* Order, Oct. 3, 1983.

tiff's rights necessary to justify an injunction.

 Plaintiffs now return with fifty [3] sworn declarations,[4] primarily of Humboldt County residents who claim injury from recent CAMP activities. These declarants variously allege warrantless searches and seizures, arbitrary detentions and destruction of property, and sustained low-altitude helicopter activity resulting in repeated invasions of privacy, emotional distress, property damage, disrupted schooling and work, and general danger to the public.[5] Plaintiffs contend, in short, that CAMP is "out of control" and has turned its areas of operations into "war zones." Plaintiffs' motion comes at the peak of the *sinsemilla* harvest in Northern California, and presumably at the height of CAMP eradication activities.

The new allegations fall into three general categories: warrantless entries, searches, and seizures on the ground; illegal roadblocks and detentions; and warrantless and dangerous helicopter surveillance. Some of the declarations and live testimony on these issues are summarized below.

**3.** These are in addition to the ten declarations originally filed by plaintiffs one year ago in support of their first motion for preliminary injunction. After the hearing and oral ruling on their second motion for preliminary injunction, plaintiffs submitted another twelve sworn declarations. The court has not based any part of this Order on these latest statements, which describe CAMP practices of the same character as those discussed *infra*.

**4.** A preliminary injunction can be granted on affidavits. *E.g. Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984). Indeed, when urgency makes it difficult to obtain affidavits, the trial court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Id.*

**5.** Although the complaint generally makes these same allegations, only five of the ten individual plaintiffs have filed supporting declarations. Further, while all of the other 66 declarants are putative members of the class, plaintiffs have not yet brought their motion to certify the class.

## GROUND SEARCHES AND SEIZURES

At least nine of the new declarants allege that CAMP personnel entered their homes or curtilage without warrants, in some cases seizing items of personal property. There is no contention that any of these declarants has been arrested or charged with any crime, and most of them explicitly deny any involvement in marijuana cultivation.

Judy Rolicheck described in her declaration and on the stand how a CAMP team of about 25 armed officers surrounded her home, ordered her family out of the house with their hands up, and held the entire family at gunpoint for two and one half hours while conducting an identification check. One of the family dogs, which Mrs. Rolicheck testified was standing still and barking, was shot and killed by a CAMP team member. Mrs. Rolicheck asked to see a warrant, and was told that "they could get one." From the evidence it appears that the nearest marijuana garden was approximately 600 yards away, and was not visible from the Rolicheck's property.

Rebecca West described in her declaration and on the stand how a CAMP helicop-

The sworn testimony of these non-party declarants is nevertheless properly before the Court for the purposes of this motion.

Owing to the peculiar function of the preliminary injunction, it is not necessary that the pleadings be perfected, or even that a complaint be filed, before the order issues. *See Studebaker Corp. v. Gittlin*, 360 F.2d 692, 694 (2d Cir. 1966); *United States v. Lynd*, 301 F.2d 818, 823 (5th Cir.1962). For the same reason, such relief cannot hinge on whether a pleaded class has yet been certified. Thus, it is not dispositive that to date plaintiffs have neither amended their complaint to include the recent declarants as named plaintiffs nor moved for certification. The Court need only determine, as a matter of probabilities, whether the currently named plaintiffs are likely to succeed on their claims and whether the exigencies of the situation merit a preliminary injunction.

On a motion for preliminary injunction, as in other evidentiary contexts, the sworn declarations of nonparties may be considered by the court in its determination of the probable validity of plaintiffs' claims. Whether the same nonparties are entitled to enjoy the benefits of the preliminary injunction is a separate issue discussed *infra*.

ter swooped down to window level, circled, and finally landed in the yard of the home she was visiting:

It's a partially completed home and there was an empty wall space ... and there were four adults and two children standing in this open space and the helicopters came over the hill, over the treetops, swooped down and it looked like a stuntman's helicopter that was going to go right through the building.... It got to the very—as close as it could get. You could see their faces and [it] swooped down and came down to another open area and dropped three men off with guns. And they knew there were children there.... We were intimidated and afraid because these men had guns and the two ladies that we were there visiting asked us to please take our children and go. So we took off and ran the other way and the helicopter followed us and chased us about a quarter mile.

West stated that the women who stayed behind were held at gunpoint while the agents conducted a fruitless search of the property.

Thom Christensen described how two CAMP agents came onto his property and ordered him to identify himself. When he asked to see a warrant, the agents left.

Charles Keyes stated that when he was not home, CAMP agents came to his home and confiscated a .22 calibre rifle. A few weeks later, after being buzzed by a CAMP helicopter while driving home, Keyes returned to find his personal property disturbed. In neither instance was a warrant or receipt left.

Paula Bartholomy alleged that CAMP entered her locked home, went through her personal belongings, and confiscated two registered handguns and her four-wheel all-terrain vehicle that she used for erosion control work. No warrant or receipt was left.

Bob Truttman complained that a CAMP helicopter landed in his yard, causing his Appaloosa mare to bolt, break the corral fence, and run off.

Ben Bertain described how CAMP used his property as a landing pad for three helicopters and 35 to 40 CAMP agents, some of whom were armed with automatic weapons:

In order to land their helicopters on my land, the CAMP officers cut down ... four fir trees and three madrone trees. One of these trees was my prized Christmas tree which I had cared for and trimmed for this Christmas season. My planted lawn was scarred and my flower gardens were completely destroyed.

Because his wife "could not bear to be at home" during the extended helicopter activity at their property, Mr. and Mrs. Bertain checked into a motel for two and one half weeks.

Similarly, on three different days CAMP used Dennis Bone's land as a "staging area":

On each of these days helicopters landed within one hundred feet of my home on more than two dozen occasions. They flew over my home at below tree top level on at least 50 different occasions on *each* of these days. They were low enough for me to clearly see facial characteristics of the helicopter crews.

Steven Swain found his home ransacked on two consecutive days, each time after CAMP agents allegedly had been working in the area. His water line was also cut. No warrant or other explanation was left.

Sigurd Anderson alleged that CAMP agents took his entire water pumping system, wrenches, and gas tanks, and chopped a water hose. No warrant or receipt was left.

The defendants have not effectively responded to these allegations. They did not file or offer to file any counter-declarations from the CAMP agents involved in the incidents alleged, call any of these agents as witnesses at the preliminary injunction hearing, or produce copies of warrants. William Ruzzamenti, a special agent of the Drug Enforcement Administration who supervises and administers the CAMP program, appeared and filed a

declaration based only on his discussion with CAMP personnel, not on personal knowledge. He testified that he never attempted to interview any of the declarants or inspect the private property at issue. As for the Rolicheck incident, he merely adopted the written investigative report of the United States Forest Service.[6]

Even if the Court were to accept as true the statements in Mr. Ruzzamenti's hearsay declaration, his account does not rebut plaintiffs' allegations. Ruzzamenti addressed seven of the twelve incidents described above. Of these, he was apparently unaware of the events described by Ms. West, he differed with Mr. Bertain as to the purpose of CAMP's presence on his property and the extent of the damage, and he appeared to concede that CAMP was on Mr. Swain's property, but only on one of the two days Swain alleged. Ruzzamenti did not directly deny the substance of these or any of the other claims of warrantless entries, searches, or seizures. Rather, in nearly every instance Ruzzamenti ambiguously stated that warrants were "executed," or "executed in the area," or "executed on the property." He did not say that these warrants particularly described the declarants' property or residences or the items to be seized. Ruzzamenti's failure to specify such details is significant in light of the official CAMP policy regarding searches and seizures on private property.

CAMP policy was described by a deputy California attorney general in a letter to plaintiffs dated September 20, 1984, and was reaffirmed both by Mr. Ruzzamenti in his declaration and by counsel at the hearing. This policy endorses warrantless entries, searches, and seizures on private property:

6. Defendants argue on their motion for reconsideration that they were denied due process in the granting of the preliminary injunction because they were given inadequate notice of the hearing and because the Court prematurely "closed the record."

The state and federal defendants received notice of plaintiffs' motion, along with the supporting declarations and memorandum, on October 10 and 11, 1984, respectively. Although plaintiffs requested a hearing date of October 11, the Court heard the matter a week later, on October 18, well within both the five-day rule of F.R.C.P. 6(d) and the discretion of the Court under Local Rule 220–2. See Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 810 (9th Cir.1963) (four-day notice of preliminary injunction hearing adequate when opposing party was knowledgable of the dispute well before the hearing and had the means to produce its witness).

A week before the hearing, Court personnel told counsel for the defendants that the Court did not know whether plaintiffs would present live testimony, thereby indicating that the Court would permit live testimony. See Local Rule 220–7. Defense counsel produced Mr. Ruzzamenti at the hearing, and examined him after plaintiffs put him on the stand. Defendants also made excellent use of their opportunity to cross examine each of plaintiffs' witnesses.

On the day of the hearing, defendants filed the declaration of Mr. Ruzzamenti. Just as the Court carefully considered this declaration before ruling, it also reviewed several declarations filed by plaintiffs earlier the same day. The timing of these filings was less than optimal, but there was no prejudice to any party: the Court generously construed Mr. Ruzzamenti's hearsay declaration, and would have reached the same conclusions had plaintiffs not filed their further declarations.

At the hearing the defendants did not ask the Court for further opportunity to produce witnesses or to gather counter-declarations from the agents involved in the alleged acts. Given this, as well as the consistency of plaintiffs' numerous declarations, the defendants' policy admissions, and the examination of the witnesses, the Court ruled from the bench after a recess. The Court never suggested that it had "closed" the record or would not consider requests for clarification or a motion for reconsideration.

Despite the Court's numerous findings of fact and conclusions of law, and the explicit terms of the injunction, defendants did not move for reconsideration until two months later. During this two-month period plaintiffs filed twelve additional declarations in support of their case, but defendants did not file or offer to file any further declarations of their own regarding the findings or terms of the injunction.

In their first motion for reconsideration, defendants filed two declarations regarding the terms of the injunction, and based on this new information the Court amended its order. See infra. In their second motion for reconsideration nearly a month later, defendants again filed declarations regarding the terms of the injunction, and again this Court amends its order as a result. Yet to this day the defendants have made no offer of testimony that would allow the Court to reconsider its findings of fact.

The Court declines to find that the defendants were denied due process in these proceedings.

While executing search warrants issued by a magistrate, which warrants may and sometimes do cover several different parcels of property within a geographical area, CAMP personnel have followed a policy of checking, for security reasons, all residences, both on the specified parcels *and those on other property in close proximity to the property for which a warrant has been issued.* In checking on such residences and other types of structures CAMP personnel will make their presence known and then *will enter unlocked structures where it appears, but it is not actually known, that someone may be present.* Locked structures in which the presence of an individual is not determined to be probable are not entered.

The purpose of such an entry is to check for the presence of persons who *might* constitute a threat to the security of the CAMP personnel, and is not made for the specific purpose of conducting a search. In accordance with state law, *items of a contraband nature which constitute evidence of a crime that are located in plain view will be seized by CAMP personnel.* For example, in one instance [the local sheriff] seized a container of marijuana in such open view and in another instance ... seized, for safe keeping, $1,200 in cash....

Letter from Thomas P. Dove to Ronald Sinoway, September 20, 1984, p. 2 (emphasis added). Later in the same letter, the deputy attorney general states:

[A]ll CAMP personnel in your area concur in the policy that ... *all residences or other structures that might hide an individual who could constitute a threat* to the safety and security of law enforcement *must be and will be secured* for the safety of the raid team members.

*Id.* at p. 4 (emphasis added).

The existence of this policy lends considerable credence to the allegations of warrantless searches and seizures and the oppressive character of the resulting encounters with innocent residents. The conclusion is inescapable that the policy, no matter how well-intentioned, gives CAMP personnel virtually unbridled discretion to enter and search private property anywhere in the vicinity of an eradication raid, and to seize personal property and detain innocent citizens without probable cause or even reasonable suspicion of any criminal activity. Moreover, it is not clear that CAMP personnel even adhere to this policy: some of the items allegedly seized were not obviously "items of a contraband nature which constitute evidence of a crime," and at least one locked structure was entered when no one was home.

■ This CAMP policy would seem to epitomize the very practices that the fourth amendment was designed to prevent, *e.g. Coolidge v. New Hampshire,* 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 *passim* (1971), and the warrantless searches alleged by the declarants appear to be *per se* unreasonable and violative of the fourth amendment. The burden is on the government to show that these searches fall within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Coolidge, supra,* 403 U.S. at 454–55, 91 S.Ct. at 2031–32; *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

■ The government suggests that its CAMP searches fall within the exception for exigent circumstances. Exigent circumstances justify a warrantless entry, search, or seizure only if the officers, "acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons ...." *United States v. Kunkler,* 679 F.2d 187, 191–92 (9th Cir.1982). Even the exigency of hot pursuit does not eliminate the requirement of probable cause. *United States v. Scott,* 520 F.2d 697, 700 (9th

Cir.1975), *cert. denied* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976).

■■■■■ The defendants argue that the mere presence of buildings on land near an eradication site poses an immediate threat to CAMP personnel and thus constitutes exigent circumstances. Assuming *arguendo* that an occasional marijuana grower would risk an assault on a heavily armed CAMP team to defend his crop, the defendants cannot logically argue that they therefore have probable cause to enter and search *somebody else's* property for no other reason than that structures are present. First, residences and structures that pose no danger to the CAMP eradication team because they are within neither eyesight nor gunshot range of the eradication site are subject to these warrantless invasions. Second, to base probable cause for a search of a neighbor's home or curtilage on the mere fact that a marijuana garden might be visible from that property is to render meaningless the fourth amendment; such a theory would give any officer in any potentially risky law enforcement situation *carte blanche* to conduct warrantless searches and seizures virtually anywhere in the vicinity of a crime.[7] *C.f. Mincey v. Arizona,* 437 U.S. 385, 393–95, 98 S.Ct. 2408, 2413–15, 57 L.Ed.2d 290 (1978) (Arizona's "murder scene exception" to warrant requirement invalid).

While the Court recognizes the dangers inherent in the CAMP program and is not indifferent to the safety concerns of CAMP personnel, such risks are no greater than those routinely faced by other law enforcement officers. These risks by themselves do not constitute exigent circumstances, and they certainly do not justify discarding the fourth amendment. *C.f. Mincey v. Arizona, supra,* 437 U.S. at 393, 98 S.Ct. at 2413 ("privacy of a person's home and

property may not be totally sacrificed in the name of maximum simplicity in enforcement of criminal law"); *Berger v. State of New York,* 388 U.S. 41, 62, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967) ("we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement"); *Zepeda v. INS,* 753 F.2d 719, 727 (9th Cir.1985) ("the INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). The CAMP policy endorsing warrantless searches and seizures on private property appears to be unconstitutional on its face.

*General Warrants*

Plaintiffs also challenge the validity of the CAMP warrants that *are* issued. They suggest that some warrants or their supporting affidavits are vague or ambiguous, or are overbroad in that they might describe multiple parcels covering hundreds of acres when gardens and associated buildings were only observed from the air on a small part of one of the parcels. Although the defendants have not satisfied the Court that their warrants meet the probable cause and particularity requirements of the fourth amendment, plaintiffs have not yet presented clear evidence to persuade the Court that CAMP's warrants are routinely deficient. If, after discovery, plaintiffs develop a clear record of warrant abuses, the Court will entertain a request for injunctive relief.

*Roadblocks and Detentions*

■■■■■ Roadblocks implicate the fourth amendment, and must comport with Supreme Court doctrine regarding vehicle stops. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Almeida-Sanchez v. United States,* 413

---

7. The defendants also suggest that the presence of footpaths traversing one or more pieces of property, or water pipes running from parcel to parcel, constitutes probable cause that a crime is being committed on the adjoining property and entitles CAMP agents to follow such paths and water pipes wherever they may lead. In the absence of a well-developed factual record the Court does not know whether paths and

pipes are more likely than not to turn up growers or illicit crops on the adjoining property. It is certainly not self-evident, however, that such paths and pipes are so uncommon in rural areas as to give rise to probable cause for a search of a neighbor's home or curtilage. In any event these objects do not justify a *warrantless* search when, as here, no extraordinary circumstances have been shown.

U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Also, threats of force may become so coercive that an investigative stop becomes an arrest, thereby requiring probable cause. *See United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974). Several of the plaintiffs and declarants were stopped on roadways by CAMP personnel who allegedly asked for identification and firearms, and checked for callused hands. One declarant alleges that her car was searched, and that she and her daughter were filmed during the stop. Several declarants also allege that they were threatened with drawn weapons. The parties disagree about the purpose and circumstances of these stops, their proximity to CAMP eradication activities, and the procedures used. Neither the plaintiffs nor the defendants have provided the Court with a clear picture of CAMP practices in this regard. If, after discovery, plaintiffs develop a clear record of abuses, the Court will entertain a request for injunctive relief.

### HELICOPTER ACTIVITIES

Most of the plaintiffs and declarants complain about intrusive and dangerous CAMP helicopter activities, and many allege sustained and repeated low-level "buzzings" and "dive bombings" of their homes. The allegations raise constitutional questions and suggest violations of federal air safety regulations.[8]

*Random Surveillance*

The accounts of Messrs. Trutman, Bone, and Bertain and Ms. West have already been noted.

One morning Charles Keyes was at home with his five-year old son, Arthur, when

four helicopters in a diamond shape came within 100 feet of our home, shaking and blowing the treetops. At about 9:30 the largest helicopter came back, put the nose of the helicopter about 100 feet away at my eye level (I live on a hillside) and hovered watching me defecate on my outhouse. I didn't move, so he moved right above me. He blew the toilet paper away from me and Arthur had to retrieve it for me. Arthur and I left the property, as I feared for our safety.

Marilyn Beckwith was similarly perturbed when she was "continually buzzed" while taking her outdoor shower.

Richard Moller described how he was relaxing in the bedroom of his rural home when a helicopter came flying within 100 feet. The helicopter "was at tree-top height and the pilot had an unhindered view of my bedroom and bed through the glass door."

Two CAMP helicopters made several passes at about 100 to 150 feet over Susan McManus' home, "flying at an angle so the people in the helicopter could observe us and what we were doing."

Timothy Taylor was working on a carpentry job when three CAMP helicopters

made at least 20 passes directly over the house I was working on at levels I estimate to be 50 to 150 feet above the house. There was no reason for the copters to fly over the house, as there are hundreds of acres in the area without any structures. The copters made at least three passes specifically checking out what was happening at the house site. On all of the passes, the madrone and oak trees were shaking. The copters came so close that they drowned out the sound of the gas generator and skilsaws.

Allison Osborne testified about one of several low flights over her home:

The reason I think it was 50 feet is it was right above the tree level, right outside my house, right over my house and at that time they tipped their helicopter several times and one of [the] times, made obscene gestures at my seven year old daughter who was standing on the ladder watching.

I could see all the details of the officers in the helicopter; I could see his

---

8. For purposes of this motion, the Court need not determine whether the helicopter practices described throughout this Order might be suffi-ciently egregious to constitute violations of substantive due process.

mustache. I couldn't see what color his eyes were but he had dark hair and I could see a name [tag] on his green fatigues.

When asked what it was like to have a helicopter passing over her at 50 or 100 feet, Osborne responded:

Well, when it's down at 50 feet your hair is actually blowing out and the leaves from the trees are blowing down on your head and the children are kind of hanging on to you because it feels like you'll be gusted away.

The fact of the matter is it's terrifying and it's—it feels like you're in Viet Nam in the Viet Nam war and the things you saw on television.

Ironically, declarant John Reilly served as a helicopter crew member in the United States Army. One day his home was buzzed by two CAMP helicopters at an altitude of 100 to 150 feet: "In my opinion the helicopters, which made two passes, were being operated in an extremely unsafe manner. They appeared to be using tactics similar to those I observed used in Viet Nam to terrorize the populace."

CAMP helicopters made at least ten passes over Andrew Camarda's house at tree top level, and Camarda claims to have monitored numerous helicopter radio transmissions. He allegedly listened to one conversation between a CAMP pilot and a ground crew: "Be advised there is a dwelling around the bend from where you are. I am looking in the window and there is a guy in there with a red shirt waving at me." In another conversation, one pilot who was low on fuel asked another pilot for advice as to where to land. "You can land up by that house, but the fellow has a camper shell propped up." "That's o.k., I can land there and just blast the camper shell down the canyon." "Do what you want."

Many of the declarants experienced these buzzings and hoverings several times, often on different days or even in successive years.

Again, the defendants have failed to contradict these reports or impeach the credibility of these declarants. Mr. Ruzzamenti testified that the helicopter pilots were selected primarily on the basis of their flying experience and ability to "manipulate" the aircraft. The only training given the pilots—who are private contractors with no law enforcement expertise—was a two-day "orientation" on technical matters. Ruzzamenti also "sat down" with the Humboldt County pilots on two occasions to discuss helicopter operations and "public contact." One of these meetings came after Ruzzamenti had received complaints, but he continued to receive complaints after the meetings. Given the uniformity of the numerous declarations, there can be only two conclusions: these technically proficient pilots were acting pursuant to instructions or the tacit consent of CAMP, or due to inadequate training and supervision they were habitually engaging in some sport of their own. In either event the fourth amendment implications of their behavior must be considered.

Any discussion of CAMP's aerial surveillance, and its use of helicopters in particular, must begin with an analysis of the "open fields" doctrine. In *Oliver v. United States*, —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court held that "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields." *Id.*, 104 S.Ct. at 1741. Indeed, the Court did not take issue with counsels' statement that police "lawfully may survey lands from the air." *Id.* Nevertheless, the individual may legitimately demand privacy for outdoor activities conducted in the "area immediately surrounding and associated with the home." *Id.* at 1742. This curtilage "is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)).

■ After *Oliver* there is little question but that CAMP can use aircraft to locate marijuana gardens in open fields, and then secure warrants to enter those gardens. When CAMP uses its air power to pry into or enter private homes or their curtilage, however, the fourth amendment comes into play.

■ Defendants contend that the declarations and live testimony in this case merely prove that "people don't like helicopters flying around." Rather, the uncontradicted evidence shows regular intrusions into the areas immediately surrounding the home. These helicopters are no longer just surveying open fields, but are deliberately looking into and invading peoples' homes and curtilage. Moreover, this prying is not limited to an occasional, casual peek during an overflight to a raid site, but is accomplished through sustained and repeated buzzings, hoverings, and dive bombings that at best disturb, and at worst terrorize, the hapless residents below.

It is not just the highly disruptive character of low helicopter flights that distinguishes them from the common airplane overflights that we are all accustomed to, but also the degree of their intrusiveness into "the privacies" of life; an airplane can see far less than a helicopter that is hovering outside a bedroom window or over an open outhouse or shower. This case demonstrates how the unique versatility of helicopters renders them at once an effective law enforcement tool and an unprecedented threat to civil liberties.

This Court knows of no legal theory that justifies such a disruptive and intrusive form of surveillance, particularly when there is not even an articulable suspicion of criminal activity. Defendants contend that their conduct is approved by *United States v. Allen,* 675 F.2d 1373 (9th Cir.1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), in which the Ninth Circuit held that the warrantless helicopter surveillance of a drug smuggler's ranch did not violate the fourth amendment. *Id.* at 1380–81. Such a reading of *Allen* ignores the distinctive facts emphasized by the *Allen* court. In that case appellant's coastal property was directly under the regular flight path of Coast Guard helicopters, and he knew or should have known of the routine patrol overflights and that such flights were for the purpose of surveillance. He also knew that his large-scale modifications of buildings and landscaping on the property, which confirmed the government's suspicions that he was smuggling drugs, were quite visible from the air. In other words, he had no reasonable expectation of privacy from aerial scrutiny. *Id; See United States v. Beale,* 674 F.2d 1327, 1333 n. 11 (9th Cir.1982) (*Allen* premised on appellant's reduced expectation of privacy). Most significantly, in *Allen* the authorities did not engage in random surveillance; they had facts to justify suspicion of criminal activity at the ranch *before* the surveillance took place. *Allen, supra,* at 1380–81. Further, they did not conduct their surveillance in a manner calculated to disrupt appellant's daily life.

In contrast, many of the plaintiffs and declarants in the case at bench state that they live in the country for privacy and quiet. In any event they had no reason to expect repeated and highly disruptive buzzings and low-level helicopter surveillance of their homes. Not only did these people have a reasonable expectation of privacy from this kind of intrusion, but it is not alleged that they were doing anything on their property that, viewed from the air, would give any cause for surveillance. Indeed, CAMP apparently had no facts whatsoever to justify attention of any kind. *Allen* is simply inapposite to the random aerial searches evident here.[9]

■ The defendants further suggest that some permutation of the "plain view" doctrine protects their prying as a matter

---

**9.** The other helicopter surveillance cases cited by the parties are also factually inapposite. *See United States v. Mullinex,* 508 F.Supp. 512 (E.D. Ky.1980) (open fields); *United States v. DeBack-*er,* 493 F.Supp. 1078 (W.D.Mich.1980) (open fields); *Dow Chemical Co. v. United States,* 536 F.Supp. 1355 (E.D.Mich.1982), *rev'd* 749 F.2d 307 (7th Cir.1984) (administrative inspection).

of law.[10] Rather, just as a CAMP agent on the ground cannot on a whim climb a fence to peer into a house otherwise protected from his view, a CAMP helicopter cannot randomly position itself over a home to leisurely contemplate the scene below. Even when CAMP agents are at a lawful vantage point, the plain view doctrine "may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983). The testimony at this stage of the proceeding does not suggest that defendants can rely on the doctrine to justify their random helicopter surveillance of homes and curtilage.

Assuming CAMP helicopters are entitled to survey open fields, it is problematic from a practical standpoint to ensure that they avert their eyes from the homes and curtilages adjoining those fields. But mere practical difficulties cannot be allowed to eviscerate fundamental constitutional protections. The injunction *infra* attempts to strike an appropriate balance between legitimate law enforcement interests and the civil liberties of California residents subjected to the CAMP program.

*Helicopter Detentions*

Aside from the fourth amendment search issues, the declarations also raise possible seizure issues. A person has been "seized" if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *E.g. Benitez-Mendez v. INS*, 707 F.2d 1107, 1108 (9th Cir.1983).

Allison Osborne's 12-year old daughter came home from school on a day when CAMP helicopters were buzzing the Osborne home within 50 feet of the roof. Her daughter

> was terrified and ran up to a neighbor's house. The helicopters chased them (two twelve-year-old girls) up Perry Meadow Road, for about 20 minutes. When my daughter and her friend would hide under the bushes, the helicopters would lift up; when the girls would try to run to the nearest house, the 'copters would come again and frighten them, so they'd jump back in the bushes and hide. They saw guns, and thought they were going to be shot!

One day Marilyn Beckwith became so afraid of the low-flying helicopters that she fled to the woods.

> The helicopter which buzzed my home continued to circle over the woods at such a low altitude that I was afraid that it was going to hit the trees. I stayed in the woods from approximately 8:30 a.m. until 5:00 p.m., and was too afraid to leave the woods and return to my home because of the constant buzzing of the helicopters.

Whether either of these incidents constituted a seizure cannot be determined from the limited evidence before the Court. However, these and other declarations suggest the inherently coercive effect of low-hovering helicopters and the sense of helplessness and terror that they can instill in law-abiding citizens. The plaintiffs have raised serious constitutional questions regarding helicopter searches and seizures.

*Federal Air Safety Violations*

In addition to the fourth amendment issues raised by CAMP helicopter practices, the complaint and the testimony already recounted suggest violations of federal air safety regulations. Several declarants described harrowing experiences away from their homes.

As Jacqui McCord drove down the road, "I looked in my rear view mirror and the yellow and black helicopter was right behind me. He then proceeded to move up a bit and hovered directly above me as I kept driving. He then proceeded to go in front

10. The "plain view" doctrine is usually applied when criminal defendants are attempting to suppress evidence. As already noted, this is not a criminal case and none of the plaintiffs or declarants has been arrested or charged with any crime. It goes without saying that the fourth amendment prohibits any unreasonable government search regardless of the outcome of that search.

of me, barely above the ground, straddling his helicopter back and forth."

Marilyn Beckwith and her son were so frightened by the helicopters buzzing their home that they tried to leave in their vehicle:

[T]he helicopter which was buzzing my home began to buzz the vehicle and create what I consider to be a dangerous situation. While we were driving, my son described to me that the helicopter was flying at a very low altitude and following us and hovered directly over the vehicle as we were traveling at approximately 30 miles per hour. It was an extremely frightening experience to be chased by this helicopter, and the experience upset my dog so much that he lost his bowels while in the vehicle.

Charles Keyes and his son were driving home when a large helicopter buzzed them. It "swooped down and hovered above us, clearly trying to get us to turn around. We kept driving and the copter eventually flew away. Moments later, a Bell 500 red and white copter buzzed us at even closer levels."

Kim Chamness also left her home as a result of "helicopters dive-bombing above my head and into my tomato garden, which was approximately 30 feet from my trailer.... As I drove out, a chopper followed me. I could even see feet dangling out above me at a low level."

Mary Darby was on horseback and observed CAMP helicopters flying at low levels and landing. As she came into a clearing,

a CAMP helicopter suddenly appeared at a very low level coming toward me. I retreated, thinking that they were going to land in said clearing. When they did not land, I turned my horse around and again proceeded down the road. As I came again into the clearing a CAMP helicopter again swooped down towards me at a very low level. This frightened my horse and again I retreated. The CAMP helicopter followed me at a very low level, frightening my horse, until it could go no further because of the trees.

Jeanne Terlinden and her husband were driving when they observed "a helicopter flying at an extremely low level, barely clearing utility lines and at times below tree top levels.... The pilot proceeded to make several dangerously low passes over the road, at which time my husband and I felt it necessary to pull off the road and stop."

These aerial antics over homes, moving vehicles, pedestrians, and equestrians appear to be gratuitous, and certainly perilous for all involved. Federal Aviation Administration (FAA) regulations govern the operation of aircraft, and provide that in sparsely populated areas helicopters "may not be operated closer than 500 feet to any person, vessel, vehicle, or structure," 14 C.F.R. § 91.79(c) (1984), unless they are operated "without hazard to persons or property on the surface." *Id.* § 91.79(d). Needless to say, helicopters may never be flown in a "careless or reckless manner so as to endanger the life or property of another." *Id.* § 91.9. It appears, in the absence of any useful counter-declarations, that CAMP pilots have violated federal safety regulations on a regular basis.

The question arises whether plaintiffs are entitled to raise such safety issues in this proceeding. With one exception not relevant here,[11] Congress did not expressly provide for a private remedy in 49 U.S.C. § 1421 *et seq.*, under which the FAA Administrator promulgates and enforces the safety regulations described above. Thus a private right of action must be implied under the factors enumerated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), or the violations must constitute a deprivation of statutory rights under 42 U.S.C. § 1983 pursuant to *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and its progeny.

**11.** 49 U.S.C. § 1487 (1984) provides that "any party in interest" may sue for an injunction for violations of § 1371 (requiring every air carrier to have an authorizing certificate from the Civil Aeronautics Board).

█ The Ninth Circuit has declined to imply a private right of action in favor of air crash victims injured as a result of violations of FAA safety regulations. *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 404–07 (9th Cir.1983). There is no apparent basis to reach a different conclusion on the facts here.

█ The lack of an implied right of action, however, does not necessarily preclude a section 1983 action for deprivation of a right established by the statute. *Keaukaha-Panaewa Community v. Hawaiian Homes,* 739 F.2d 1467, 1469, 1470 (9th Cir.1984); *Boatowners and Tenants Ass'n v. Port of Seattle,* 716 F.2d 669, 674 (9th Cir.1983). The plaintiff who seeks to enforce a federal statutory right under section 1983 need not demonstrate congressional intent to provide access to that remedy. *Boatowners, supra,* at 674 (citing *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20 n. 31, 101 S.Ct. 2615, 2626 n. 31, 69 L.Ed.2d 435 (1981)). Rather, such a plaintiff enjoys a presumption that his statutory rights are enforceable in a section 1983 action. *Id.* (citing *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 51, 101 S.Ct. 1531, 1557, 67 L.Ed.2d 694 (1981) (White, J., dissenting in part)).

█ A preliminary question is whether the statute at issue is "the kind that created enforceable 'rights' under section 1983." *Middlesex, supra,* 453 U.S. at 19, 101 S.Ct. at 2626 (1981). The Ninth Circuit has rejected any limitation of the term "rights" to mean merely civil or personal rights. Instead, there is an enforceable right in favor of a plaintiff if that plaintiff is "one of the class for whose *especial* benefit the statute was enacted," *Boatowners* at 672 (citing *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original)), and if "Congress intended to confer federal rights upon those beneficiaries." *Id.* (citing *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981)). *See Lauritzen v. Lehman,* 736 F.2d 550, 557 n. 8 (9th Cir.1984).

█ It is beyond dispute that Congress' "whole purpose" in creating the FAA was to promote safe air travel, and to protect the lives and property of people on the ground as well as of air travelers. *Rauch v. United Instruments, Inc.,* 548 F.2d 452, 457 (3d Cir.1976); *S.W. Aircraft Inc. v. United States,* 551 F.2d 1208, 1212, 213 Ct.Cl. 206 (1978). Thus the plaintiffs in this case, all ground dwellers who faced rather immediate threats from low-flying aircraft, are clearly members of the "class for whose especial benefit" the statute and regulations were created. *See Rauch, supra,* at 457.

The corollary to this conclusion is that the plaintiffs enjoy a federal right to be free from the dangers of hazardous aviation practices. In 49 U.S.C. § 1421(a)(6) Congress mandated, not merely suggested, that the FAA establish appropriate safety regulations. *C.f. Keaukaha-Panaewa Community, supra,* at 1471 (citing *Pennhurst,* 451 U.S. at 20, 101 S.Ct. at 1541). Citizens are entitled to rely on these regulations as they go about their daily affairs. Indeed, the government regularly enforces these standards, and frequently sanctions pilots for safety violations even in the absence of any accident or injury. *See, e.g., Barnum v. National Transp. Safety Bd.,* 595 F.2d 869, 870 (D.C.Cir.1979). Such stringent federal enforcement demonstrates the importance and vitality of these rights.

The remaining question is whether Congress foreclosed enforcement by way of section 1983 in the FAA statute itself. The Ninth Circuit requires a strong showing of congressional intent before ruling out a section 1983 claim, and looks to the comprehensiveness of the statute's enforcement scheme and whether a section 1983 remedy would interfere with that scheme. *Keaukaha-Panaewa Community, supra,* at 1470–71.

█ The Federal Aviation Act creates an extensive public enforcement scheme. *See In re Mexico Air Crash, supra,* 708 F.2d at 407. With the one exception noted

above, the statute reserves the initial right to sue in the federal government. *C.f. Keaukaha-Panaewa, supra,* at 1471 (no comprehensive enforcement scheme in a statute that was limited to single public remedy). Moreover, the private administrative remedy in 49 U.S.C. § 1482 provides only that "any person *may* file a complaint with the agency." Congress' focus on public and primarily administrative enforcement suggests that it considered the presumably expert federal agency to be the most appropriate, but not necessarily the only, forum for resolving air safety complaints.

It is certain, however, that Congress did not anticipate a massive, joint federal/state crime control program that would regularly expose large segments of the population to hazardous aviation practices. Even in the best of circumstances federal agencies are ill-equipped to expeditiously investigate and dispose of multitudinous claims. When, as here, the issue is a particular government *policy* of helicopter use rather than isolated incidents of pilot error or misbehavior, it does not make sense to limit plaintiffs to an administrative remedy. There is little need for technical expertise or agency investigations in the face of such a law enforcement policy, but there is an acute need for consistent and speedy judicial resolution given the related constitutional issues involved and the injunctive relief requested.

■ A section 1983 action is particularly appropriate when a government policy exposes the public to risk, and agents of the state pursue this policy in violation of federal law. Neither the legislative history of the FAA statute, the statute, nor logic suggests that Congress intended to preclude a section 1983 action under these circumstances. Rather, in a case such as this a section 1983 action may well be the only effective way to achieve Congress' goal of ensuring air safety, and to protect the lives of Northern California residents living in the areas targeted by the CAMP program.[12]

■ Finally, a section 1983 remedy is not inconsistent with the FAA's administrative enforcement scheme. Private injunctive relief would complement, not impair, the Administrator's authority to obtain such relief. The civil and criminal penalties allowed by 49 U.S.C. §§ 1471 and 1472 have never precluded separate tort actions for damages by those injured by a violation, and are no less viable in conjunction with a section 1983 damages claim. In sum, plaintiffs may assert violations of federal air safety laws as a claim for relief under 42 U.S.C. § 1983.[13]

## THE AVAILABILITY AND SCOPE OF INJUNCTIVE RELIEF

■ Defendants argue at the outset that no pattern of misconduct has been shown, and that plaintiffs should be limited to whatever damages remedy they may have.[14] Yet even a cursory review of CAMP policy and the testimony belies the argument that this case merely involves an occasional transgression by an errant

12. Indeed, the testimony raises some doubts about the ability or willingness of the FAA to pursue CAMP violations. Declarant Alan Zins, a former air traffic controller, attempted to involve the FAA after watching a CAMP helicopter fly over the heavily populated business district of Redway at a height of no more than 250 feet. The FAA did not take a report of the incident, apparently because the helicopter's identifying number was covered up. The FAA referred Zins to a phone number for "Complaints about CAMP." The phone number was that of the California Department of Justice, a defendant in this case. There is no evidence as to whether the FAA routinely refers citizens to CAMP.

13. In their second motion for reconsideration, defendants mistakenly characterize paragraphs

3 and 4 of the injunction as resting solely on the preceding FAA analysis. These portions of the injunction are also addressed to the alleged constitutional violations described *supra.*

14. Defendants also argued at the hearing that an injunction is inappropriate because the 1984 program was virtually at an end. However, defendants concede that they intend to continue their program in future years, and they do not suggest that they will voluntarily cease the allegedly illegal conduct. Even if they so promised, this Court would still be able to grant injunctive relief. *See Enrico's, Inc. v. Rice,* 730 F.2d 1250, 1253 (9th Cir.1984).

CAMP agent. Further, it is a legal commonplace that injunctive relief is available when constitutional rights are being violated, regardless of a damages remedy at law. *E.g. Henry v. Greenville Airport Comm'n,* 284 F.2d 631, 633 (4th Cir.1960); *see generally* Wright & Miller § 2948 & n. 39 (1973 & Supp.1984). The very purpose of the preliminary injunction is to prevent the irreparable loss of rights before judgment, *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir.1984), and the right to be free from unreasonable searches and seizures is so central to our constitutional democracy that any deprivation of that right constitutes irreparable harm.

Nevertheless, in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court counseled "restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate." *Id.,* 103 S.Ct. at 1670. The Court found that the plaintiff, who had been choked nearly to death by police, had no "standing" to ask for an injunction because he had failed to show irreparable injury—namely, a "real or immediate threat that the plaintiff will be wronged again." *Id.* The Court suggested that the plaintiff needed to show that the police department authorized the use of the deadly chokeholds without provocation or legal excuse, as well as credibly allege that he faced a realistic threat that he himself would be stopped by the police and choked again. *Id.* at 1667–68 & n. 7. The Court noted: "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Id.* at 1668 n. 8 (emphasis in original).

■ The plaintiff in *Lyons* was one of millions of citizens in a huge metropolitan area served by relatively few police officers. As a matter of probabilities, there was at best only a remote chance that he would be stopped and choked again. In contrast, the plaintiffs in the present action live in sparsely populated rural areas where marijuana cultivation is rife. These are the areas where CAMP plans to return repeatedly each season until the growers throw in the towel. CAMP's far-ranging overflights necessarily subject large geographic areas—and consequently a large percentage of the rural population in these areas—to repeated aerial surveillance and related ground activities. Moreover, official CAMP policy virtually ensures that once CAMP enters an area, some residents who have nothing to do with the cultivation around them, and who give CAMP personnel no articulable ground for suspicion of criminal activity, will experience warrantless searches and seizures.

That plaintiffs themselves are likely to face the same or similar invasions again is demonstrated by the course of events thus far. Many of the declarants have been subjected to the invasive helicopter activity on several different occasions, often on different days or in successive years. So long as the plaintiffs live in the general vicinity of marijuana gardens, they face a real and immediate threat of repeated constitutional violations from CAMP air and ground enforcement activities. Even if particular growers move their gardens as a result of CAMP raids, or close shop entirely, the same neighbors will still be subject to CAMP activities until CAMP is satisfied that the area has been purged of growers. Since the effectiveness of the CAMP program rests in part on its perseverance in returning to the same areas from season to season, the probabilities are high that the plaintiffs in this case will suffer injury for years to come. Plaintiffs are therefore entitled to request injunctive relief.

■ To obtain a preliminary injunction, plaintiffs must *either* establish probable success on the merits and the possibility of irreparable injury, *or* present serious questions and show that the balance of hardships tips sharply in their favor. *E.g. Students of California School for the Blind v. Honig,* 736 F.2d 538, 542 (9th Cir.1984) (citing *Beltran v. Myers,* 677 F.2d 1317, 1320 (9th Cir.1982)). It bears repeat-

ing that this Court is not required to make any binding findings of fact, but need only find probabilities that the necessary facts can be proved. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984).

■ The plaintiffs in this case are entitled to relief under either standard. They have demonstrated the probable constitutional infirmity of CAMP's warrantless search and seizure policy and helicopter surveillance practices. In light of the testimony the plaintiffs are likely to be entitled to declaratory or permanent injunctive relief to prevent continuing irreparable harm in the form of violations of their constitutional rights.

Alternatively, plaintiffs have presented "serious questions," *i.e.* questions as to which they have "a fair chance of success on the merits," *Sierra On-Line, Inc., supra*, 739 F.2d at 1421 (9th Cir.1984) (citing *Benda v. Grand Lodge of the Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir. 1978), *cert. denied* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979)), regarding those CAMP policies and practices that appear to violate the fourth amendment. Again, plaintiffs have presented the Court with considerable factual material indicating that they have a "fair chance of success" in obtaining, at the very least, declaratory and permanent injunctive relief.

It is also clear that the balance of hardships tips sharply in favor of plaintiffs. On the one hand, critical constitutional rights of the plaintiffs are in jeopardy for so long as CAMP pursues its current policies. On the other hand, the defendants have not suggested that warrantless searches and seizures on the ground are necessary for the success of the CAMP program. Indeed, there is no evidence before the court that CAMP's warrantless searches and sei-

zures have resulted in any arrests, seizures of marijuana crops, or elimination of real danger to CAMP personnel.

Similarly, there has been no suggestion that the random helicopter surveillance and harassment alleged by the plaintiffs and declarants is an integral component of the CAMP program. Rather, it is apparent that fixed-wing aircraft are quite capable of spotting marijuana gardens. Mr. Ruzzamenti testified that helicopters only spend about five percent of their air time conducting surveillance; they spend the rest of their time taking CAMP personnel and cut crops to and from the raid sites. Ruzzamenti further testified that helicopter surveillance may represent "a fraction of one percent" of all CAMP reconnaissance for marijuana, and that helicopters are needed only in canyons where possible downdrafts might threaten an airplane.[15] There is no evidence concerning how much marijuana, if any, is generally found in such canyons.

Thus, a conservative order that merely enjoins CAMP from conducting warrantless searches and seizures and indiscriminate and dangerous helicopter surveillance will not materially impair the CAMP program or the public's interest in marijuana eradication. Such a temporary injunction will, however, safeguard the fundamental constitutional rights of the plaintiffs until trial is had on the merits of the case.

■ The final question is whether the putative class members or other nonparties are entitled to enjoy the benefits of this preliminary injunction before the class is certified. In *Zepeda v. INS*, 753 F.2d 719 (9th Cir.1985), the Ninth Circuit restated the traditional rules that a court may not determine rights of persons not properly before it, and that injunctive relief should be narrowly tailored to remedy the specific

---

**15.** As a result of Mr. Ruzzamenti's testimony the Court initially enjoined helicopter surveillance entirely. It appeared that the negligible impact on the CAMP program would be far outweighed by the certain protection of plaintiffs' rights. In the defendants' motions for reconsideration and stay, Mr. Ruzzamenti changed his testimony. He now states that, at least during the "Spring Raid" on public lands, helicopters are a critical component of the CAMP program. Giving Ruzzamenti and other declarants for the defendants the benefit of the doubt, the Court has twice amended the terms of its preliminary injunction to allow limited helicopter surveillance of open fields.

harms shown by plaintiffs rather than all possible breaches of the law. *Id.* at 728 n. 1. When a class has not been certified, the court suggested, no one but the named plaintiffs are entitled to protection unless it is "inevitable" that class-wide relief is necessary to provide adequate relief to the plaintiffs. *Id.* at 728 & 729 n. 1.

At the outset it must be noted that this Court has already recognized the standing not only of the ten named individuals, but of two organizational plaintiffs as well: the National Organization for the Reform of Marijuana Laws and the Civil Liberties Monitoring Project. These organizations are properly asserting the rights of their members in this litigation, and the record indicates that they have numerous members throughout California and in the particular areas targeted by CAMP. All of these individuals are entitled to the preliminary relief requested, *viz.* protection from warrantless searches and seizures on the ground and indiscriminate and dangerous helicopter surveillance. Whereas in *Zepeda* the defendant INS merely had to avoid inappropriate face-to-face contact with the seven named plaintiffs, CAMP would have to tread very gingerly indeed to avoid the numerous and unknown plaintiffs here. The wide-ranging and quick-paced character of CAMP surveillance and raid activities makes it virtually impossible for CAMP agents in the field and in the air to distinguish the parties from the nonparties, or to appropriately and timely limit their behavior if they do. Without class-wide relief, the plaintiffs would be at significant risk for repeated rights violations, and the preliminary injunction remedy would be rendered meaningless.

The *Zepeda* court also was concerned that a district court's "power to issue a preliminary injunction should not be broader in scope with respect to nonparties than its powers following a full trial on the merits." *Id.* at 728 n. 1. The present case,

unlike *Zepeda*, involves written policy statements that on their face require CAMP agents to conduct warrantless searches and seizures without probable cause, and that condone random helicopter surveillance of homes and curtilage. The testimony of parties and nonparties alike strongly suggests that these policies have led to ongoing, widespread, and uniform rights violations. As with statutes that purport to authorize police to violate the fourth amendment, this court has a duty to strike down those agency policies that by their own terms virtually ensure fourth amendment violations.[16] *See Tennessee v. Garner,* — U.S. —, 105 S.Ct. 1694, — L.Ed.2d — (1985) (deadly force statute invalidated as violative of fourth amendment); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 325, 98 S.Ct. 1816, 1827, 56 L.Ed.2d 305 (1978) (warrantless search provision of OSHA Act invalidated as violative of fourth amendment); *Berger v. State of New York,* 388 U.S. 41, 63–64, 87 S.Ct. 1873, 1885–1886, 18 L.Ed.2d 1040 (1967) (eavesdropping statute invalidated as violative of fourth amendment); *see also Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1861 & n. 1, 75 L.Ed.2d 903 (1983) (state vagrancy statute unlawful under fourth amendment) (Brennan, J. conc.); *Sibron v. New York,* 392 U.S. 40, 61, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917 (1968) (government may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct"). Thus if the plaintiffs in this case prevail after a trial on the merits, the challenged CAMP policies will be invalidated, and all California residents necessarily will be protected by declaration and permanent injunction. The nonparties will receive no broader relief from the preliminary injunction now than they would be entitled to after such a judgment.

---

**16.** As noted earlier, there is no evidence of pending or threatened criminal prosecution of these plaintiffs. Thus the policies underlying *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny are not apposite. In any event, mere agency policies should be afforded less deference from federal courts than state criminal statutes, particularly when, as here, there is evidence of ongoing harassment and abuse.

## FINDINGS AND ORDER

1. CAMP personnel on numerous occasions have conducted warrantless searches and seizures. The defendants have failed to show any exigent circumstances or other exceptions to the warrant requirement that would justify these fourth amendment violations.

2. CAMP has regularly used helicopters in a manner that constitutes warrantless searches of homes and curtilages in violation of the fourth amendment, and in a manner that may have effectively detained individuals without reasonable suspicion or probable cause in violation of the fourth amendment.

 3. CAMP has regularly violated applicable Federal Aviation Administration regulations and has posed an ongoing hazard to the public. Any helicopter surveillance conducted in violation of FAA safety regulations is presumptively an unreasonable manner of search.

4. CAMP policy and the defendants heretofore either have condoned or failed to correct these practices, despite citizen complaints and the concern previously expressed by this Court.

5. Absent immediate injunctive relief, the plaintiffs, the declarants, and other California residents similarly situated in the several areas where CAMP is operating are likely to suffer irreparable harm in the form of continued violations of their constitutional rights. For so long as the CAMP program continues this year or in future years, these same residents are likely to suffer the same or similar injuries again.

6. The plaintiffs have demonstrated probable success on the merits of at least some of their claims, or in the alternative have raised serious questions and have a fair chance of success on those claims.

7. The Court has no desire or intention to hamper the legitimate law enforcement efforts of CAMP personnel. Fortunately, the effectiveness of the CAMP program does not hinge on warrantless searches and seizures or the indiscriminate and dangerous use of helicopters for surveillance. Neither the CAMP program nor the public interest in marijuana eradication will be significantly impaired by restrictions on these activities that merely conform them to constitutional and statutory requirements.

Good cause appearing therefor, the Court enjoins the defendants and each of them in the following manner: [17]

1. Defendants and CAMP personnel are enjoined from entering by foot, motor vehicle, or helicopter any private property other than open fields without a warrant obtained on probable cause.

2. When defendants are on public land, or on private land pursuant to a proper warrant, they are enjoined from entering adjacent or nearby private property other than open fields, unless a warrant issues on probable cause, or unless exigent circumstances exist. Mere speculation that a nearby parcel of land may in some way pose a hazard to CAMP personnel does not constitute exigent circumstances.

3. Defendants are enjoined from using helicopters for general surveillance purposes, except over open fields. When con-

---

**17.** Defendants contend on their motion for reconsideration that the terms of the injunction, particularly the restrictions on helicopters, are imprecise and unworkable, and unfairly put CAMP agents at risk of contempt for inadvertent and unavoidable violations.

The Court first notes that in the nearly six months since the injunction issued, the Court has not had the benefit of any counter-proposals from the defendants; they remain faithful to their position that the injunction is invalid in any form. Nor have the defendants offered any persuasive evidence that the injunction is unworkable *per se*; they have merely demonstrated that CAMP agents will have to use greater foresight and planning than in the past, and will no longer enjoy unfettered freedom in their work. As noted above, the defendants cannot claim injury from a mandate that they respect the rights of area residents.

On April 19, 1985, the Ninth Circuit Court of Appeals denied defendants' emergency motion for a stay of the injunction pending appeal, but clarified that the altitude restrictions described in paragraphs 3 and 4 are applicable only to deliberate, knowing, and intentional conduct. Purely inadvertent violations will not place defendants in contempt of court.

ducting surveillance over open fields, helicopters shall not fly within 500 feet of any structure, person, or vehicle.[18] Helicopters surveying open fields in the vicinity of residential structures shall not fly within the hemisphere extending 500 feet from the outer circumference of the curtilage of any residence, and shall not survey any home or curtilage.

4. When CAMP helicopters are not conducting surveillance, but are ferrying personnel, supplies, or cut crops, the helicopters shall take the most direct route available that overflies the fewest possible private residences, unless safety requires otherwise. Helicopters shall maintain an altitude of at least 500 feet, except when landing on or leaving the target property, or unless safety requires otherwise.

5. Before any further CAMP flights or ground activities are undertaken, defendants are ordered to: a) meet with all CAMP pilots, and all supervisorial ground personnel, and instruct them as to the content of this order; b) give all CAMP personnel a complete copy of the terms of this injunction; and c) submit to the Court appropriate affidavits detailing this instruction and distribution.

This Order supersedes the preliminary injunction orders issued October 18, 1984, and February 20, 1985, and will be in effect from April 12, 1985, until further order of this Court or until resolution at trial on the merits. The Order is in force for all CAMP activities in all California counties. The motion for stay is denied.

IT IS SO ORDERED.